# EISENMANN

## SUBCONTRACTOR

## GENERAL TERMS AND CONDITIONS

## (EN 8/00)

**150 E. Dartmoor Drive • Crystal Lake Illinois 60014 • Phone (815) 455-4100 • Fax (815) 455-1018**

# INDEX

1.  DEFINITIONS ..................................................................................3
2.  BONDS ..........................................................................................4
3.  CHANGES IN THE WORK ...............................................................4
4.  DRAWINGS, SPECIFICATIONS AND DESIGN INFORMATION ...............5
5.  CONFIDENTIALITY OF TECHNICAL AND COMMERCIAL INFORMATION ........5
6.  SCHEDULING AND PROGRESS OF THE WORK; WORK STOPPAGES ........6
7.  ENVIRONMENTAL HAZARDS; INDEMNIFICATION ...............................7
8.  EQUIPMENT SUPPLIED BY OTHERS ................................................8
10. LIMITATION OF LIABILITY ...............................................................9
11. CARE OF THE WORK .....................................................................10
12. LABOR HARMONY .........................................................................10
13. CLEAN UP ....................................................................................10
14. SAFETY ........................................................................................11
15. INSURANCE ..................................................................................11
16. INDEMNIFICATION .........................................................................11
17. PATENT INFRINGEMENT ................................................................12
18. SUBCONTRACT PRICE ..................................................................13
19. MECHANICAL COMPLETION AND FINAL ACCEPTANCE OF THE WORK ........13
20. SUBCONTRACTOR'S PERFORMANCE GUARANTEE AND WARRANTY ........14
21. SUBCONTRACTOR'S RECORDS .....................................................15
22. CLAIMS AND LIENS FOR LABOR AND MATERIAL ............................15
23. DEFAULT ......................................................................................15
24. SUBCONTRACTING AND ASSIGNMENT ..........................................16
25. FORCE MAJEURE ..........................................................................17
26. TERMINATION FOR CONVENIENCE .................................................17
27. SUSPENSION OF WORK .................................................................17
28. DELAY IN COMPLETION .................................................................18
29. POSSESSION PRIOR TO OWNERSHIP TRANSFER ...........................18
30. PUBLICITY ....................................................................................18
31. COMPLIANCE WITH LAWS .............................................................19
32. TAXES, DUTIES AND FEES .............................................................19

33. DISPUTES ..................................................................................................... 19

34. INTERPRETATION ........................................................................................ 20

35. FIELD PURCHASE ORDER PROCEDURE ................................................. 21

36. SPECIAL ORDER FORM .............................................................................. 22

37. COMPOSITE LABOR RATES ....................................................................... 23

38. INVOICING PROCEDURES ......................................................................... 24

# EISENMANN CORPORATION
## SUBCONTRACTOR
## GENERAL TERMS AND CONDITIONS

## 1.  DEFINITIONS

1.1.  Each item defined or explained in any other portion of this Subcontract shall have the same meaning for purpose of these General Terms and Conditions.

1.2.  "Subcontract" means collectively these General Terms and Conditions and the other Subcontract documents described in the purchase order to be executed by CONTRACTOR and SUBCONTRACTOR upon acceptance of SUBCONTRACTOR's proposal.

1.3.  "CONTRACTOR" means EISENMANN CORPORATION.

1.4.  "SUBCONTRACTOR" means the person and/or company named as subcontractor in the purchase order.

1.5.  "OWNER" means the company named as owner in the purchase order.

1.6.  "Project" means the project specified in the purchase order.

1.7.  "Work" or the "Subcontract Work" means the work to be performed by SUBCONTRACTOR, as specified in the purchase order. The "Entire Work" means all the work to be performed under the prime contract between Owner and EISENMANN CORPORATION.

1.8.  "Subcontract Price" means the price to be paid SUBCONTRACTOR for the work as specified in the Signature Document.

1.9.  "Plant" means the permanent facility at which the product of the entire work performed under the Prime Contract, of which the Subcontract work is a part. It does not include any temporary structures or any other property not intended to be incorporated in the Plant.

1.10.  "Sub-subcontractor" means a contractor or vendor of any tier directly or indirectly contracting with SUBCONTRACTOR to perform any part of the Work. "Sub-Subcontractor" shall mean SUBCONTRACTOR's contract with a Sub-Subcontractor.

1.11.  "Date of preliminary completion of the Work" means the date of issuance by CONTRACTOR to SUBCONTRACTOR of notice of substantial completion as herein provided.

1.12.  "Date of Final Acceptance of the Work" means the date of issuance by CONTRACTOR to SUBCONTRACTOR of notice of final acceptance of the Subcontract Work as herein provided.

1.13.  The term "Environmental Hazard" refers to any hazardous or dangerous substance or material including, but not limited to. Substances and material defined or referred to as "hazardous substances", "toxic substances", "hazardous waste" and similar terms in

---

a) The following laws as they may be amended from time to time: Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9061; Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq.; Toxic Substance Control Act, as amended, 15 U.S.C. § 2601, et seq.; Resource Conservation and Recovery Act, as Amended, 42 U.S.C. § 6901, et seq.; Clean Water Act, 33 U.S.C. § 1321;

b) Any other laws designated or referred to in the Signature Document;

c) All other federal, state and local statutes and ordinances governing the Work site and relating to hazardous wastes and toxic substances; and

d) The rules and regulation adopted and publications promulgated pursuant to any of the foregoing.

## 2.  BONDS

As security for the performance of its obligations under this Subcontract (and not as a measure of damages) and at the discretion and cost of CONTRACTOR, SUBCONTRACTOR shall furnish at least ten (10) days prior to commencing the work, a performance bond and a labor and material payment bond in the amount of 100% of the contract price containing such provisions and issued by such insurance companies as shall be satisfactory to CONTRACTOR.

## 3.  CHANGES IN THE WORK

3.1. CONTRACTOR may order changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, the Subcontract Price and the Scheduled Date of Substantial Completion of the Work being adjusted accordingly. All such changes in the Work shall be authorized by Work Order and shall be executed under the applicable conditions of the Subcontract. No such Work Order shall in any way invalidate this Subcontract and any such Work Order may be revoked by CONTRACTOR at any time before it is agreed to by SUBCONTRACTOR and before CONTRACTOR shall give SUBCONTRACTOR notice to proceed as provided in paragraph 3.4

3.2. A Work Order is a written order to SUBCONTRACTOR signed by CONTRACTOR after the execution of this Subcontract, directing a change in the Work or an adjustment in the Subcontract Price or the Scheduled Date of Mechanical Completion of the Work. Only a Work Order may change the Subcontract Price and the Scheduled Date of Completion of the Work. CONTRACTOR may include in any Work Order a request for a prompt estimate of SUBCONTRACTOR's cost, expense and time required by reason of any change in the Work reflected in such Work Order.

3.3. The cost of credit to CONTRACTOR resulting from a change in the Work shall be determined by mutual acceptance of a lump sum property itemized: but if no lump sum is agreed upon then either:

a) by unit prices stated in this Subcontract or subsequently agreed upon;

or

b) by reimbursement of SUBCONTRACTOR's cost plus a mutually acceptable fixes or percentage fee.

3.4. If neither of these methods is agreed upon, SUBCONTRACTOR shall nevertheless promptly proceed with the Work involved. SUBCONTRACTOR shall keep an itemized accounting of its cost and expenses of such change in the Work, together with appropriate support data. As soon as SUBCONTRACTOR completes the Work provided for the Work Order the parties shall negotiate the determination of a fair adjustment to the Subcontract Price and the Scheduled Date of Completion of the Work in the light of such change in the Work; if none is so agreed, the matter shall be resolved by arbitration as provide in paragraph 31 hereof.

## 4. DRAWINGS, SPECIFICATIONS AND DESIGN INFORMATION

4.1. Upon CONTRACTOR's request all shop and other drawings and specifications prepared by SUBCONTRACTOR shall be submitted by it to CONTRACTOR for approval before SUBCONTRACTOR proceeds with installation, but CONTRACTOR's approval thereof shall not relieve SUBCONTRACTOR of any of its responsibility thereunder.

4.2. Should any Work be required under the Subcontract which is not denoted in CONTRACTOR's drawings, specifications and design information but which is nevertheless necessary for the proper carrying out of the intent hereof, SUBCONTRACTOR understands the same is implied and required and shall perform all such Work and furnish all such material as fully as if specifically denoted therein. It is not intended, however, that Work not covered by or clearly inferable from CONTRACTOR's drawings and specifications shall be supplied unless shown on the drawings.

## 5. CONFIDENTIALITY OF TECHNICAL AND COMMERCIAL INFORMATION

5.1. SUBCONTRACTOR shall hold in confidence all information of the following kinds, and shall not divulge the same to third parties or use it in any way other than for accomplishing the Work without CONTRACTOR's prior written approval so long as and to the extent that such information is not in the public domain, or was not prior to receipt from CONTRACTOR already in the possession of SUBCONTRACTOR.

a) any technical information disclosed, directly or indirectly, by CONTRACTOR to SUBCONTRACT, with respect to the Work.

b) any drawings or designs showing process equipment or devices;

c) any machinery, materials or equipment in which and by which the process is to be performed or carried out;

For the purpose of the provisions of this paragraph 5, disclosures relating to the Work which are specific, e.g., as to equipment, products or operating conditions, shall not be

deemed to be in the public domain or in the prior possession of SUBCONTRACTOR merely because they or individual features thereof, are embraced by general disclosures in the public domain or in the possession of SUBCONTRACTOR, unless the combination itself and its principle of operation are in the public domain or in the prior possession of SUBCONTRACTOR.

5.2.  SUBCONTRACTOR may, under the same secrecy conditions required of SUBCONTRACTOR under the paragraph 5, disclose to its Sub-Contractors a limited part of the technical information to be held in confidence under the foregoing provisions, to the extent such is necessary for the prosecution of the Work. SUBCONTRACTOR shall obtain in advance appropriate written non-disclosure agreements from it Subcontractors.

5.3.  Nothing contained herein shall prevent SUBCONTRACTOR from using information it can show was lawfully disclosed to it in writing by a third party who did not acquire it, directly or indirectly, from CONTRACTOR or OWNER if and to the extent that SUBCONTRACTOR's use is in accordance with any terms under which such information is disclosed to SUBCONTRACTOR by said third party.

5.4.  The provisions of this paragraph 5 shall:

   a) Be without prejudice to the provisions of any prior agreement between the parties concerning the confidentiality of and/or the license of any proprietary information or trade secrets; and

   b) Survive ten (10) years after disclosure of the technical information notwithstanding any termination of this Subcontract.


## 6. SCHEDULING AND PROGRESS OF THE WORK; WORK STOPPAGES

6.1.  SUBCONTRACTOR shall forthwith prepare (I) a work Schedule showing the starting and finishing dates of significant activities and major milestones in bar chart or network form and (ii) a schedule relating to the expediting of Work, by telephone and shop visits, and expediting the procurement of equipment and materials to be used in the Work and the inspection of fabrication of equipment and of materials, including the type and frequency of inspection, which schedules shall be approved by CONTRACTOR. SUBCONTRACTOR shall use its best efforts to meet such schedules. The provisions of this paragraph are without prejudice to SUBCONTRACTOR's obligation to complete the Work on or before the Scheduled Date of Final Acceptance of the Work provided for paragraph 3 of the Signature Document.

6.2.  If CONTRACTOR determines that SUBCONTRACTOR has at any time failed to maintain sufficient progress in carrying out the Work to assure that it will be able to bring it to the state of Financial Acceptance on or before the Schedules Date of Final Acceptance of the Work, it shall have the right to require SUBCONTRACTOR to accelerate the progress of the Work, at SUBCONTRACTOR's cost and expense, by the addition of more labor or equipment or by such other means as may be appropriate. Such right on the part of CONTRACTOR shall not imply any obligation on its part and shall be in addition to all other rights and remedies it may have.

6.3.  SUBCONTRACTOR covenants and agrees as follows:

a) During the entire period of its performance of the Work thereunder it will not initiate, suffer or permit any work stoppage to occur. The term "work stoppage" shall mean any stoppage of the Work in connection with a labor dispute, including but not limited to: strike, walkout, slowdown, picketing, sympathy strike, weather based upon jurisdictional or other disputes and whether the result of labor disputes involving CONTRACTOR, SUBCONTRACTOR or any other person; or the observation of any picketing of any nature; or any lockout; by SUBCONTRACTOR. No work stoppage will constitute force majeure or other excusable delay.

b) If SUBCONTRACTOR is, or during the course of the performance of the Work thereunder becomes, and employer of any union labor, it will, as a condition of its entering into this Subcontract (or as a condition of its right to continue to perform Work thereunder if it becomes such an employer after entering into this Subcontract), enter into a collective bargaining agreement with the union concerned under which such union shall agree that for the entire term of the performance of the Work its members, agents, representatives and employees shall not allow, incite, encourage, condone or participate in any work stoppage. Said contract obligation of the union shall be valid and enforceable for the entire period of performance of the Work. If any such work stoppage should occur, SUBCONTRACTOR shall take all necessary steps promptly to enforce such obligation.

6.4.   If any work stoppage shall occur or if SUBCONTRACTOR shall default in the performance of any of its obligations under this paragraph 6, then CONTRACTOR shall have the right (in addition to any other rights and remedies it may have) to take over the Work from SUBCONTRACTOR and perform such Work itself or by any other person it may select, in either case at the cost of SUBCONTRACTOR. CONTRACTOR may exercise such right by notice to SUBCONTRACTOR at any time after 48 hours have elapsed from the time such work stoppage, breach or other condition has existed, by serving written notice of such exercise upon SUBCONTRACTOR. SUBCONTRACTOR shall in such event bear all costs incurred by CONTRACTOR in connection with the completion of the Work, without limitation to the amount of the Subcontract Price or otherwise.

## 7.   ENVIRONMENTAL HAZARDS; INDEMNIFICATION

7.1.   SUBCONTRACTOR shall immediately notify CONTRACTOR if SUBCONTRACTOR or any of its Sub-Subcontractor cause a release of any Environmental Hazard at the Work site while the Work is proceeding.

7.2.   SUBCONTRACTOR shall indemnify, defend and hold harmless CONTRACTOR, OWNER and each of their agents and employees from and against any and all claims, cause, penalties, damages and/or response or remedial cost, including, but not limited to, attorney's fees, arising in connection with the release, but only to the extent such release is caused by SUBCONTRACTOR its Sub-Subcontractors or their agents or employees. The term "release" as used in this subparagraph shall have the same meaning as that term has in 42 U.S.C. § 9601.

**EQUIPMENT SUPPLIED BY OTHERS**

8.1.    CONTRACTOR shall deliver to SUBCONTRACTOR any equipment to be incorporated within the Work, which is provided by OWNER, CONTRACTOR or others on board carrier at the site of the Work, and thereafter it will be in SUBCONTRACTOR's custody and control until the Date of Substantial Completion of the Work.

# 9.    OWNER, CONTRACTOR AND SUBCONTRACTOR

9.1.    The Work to be performed by SUBCONTRACTOR thereunder shall be done by it as an independent contractor, CONTRACTOR being interested only in the results obtained, and having the general right of inspection and supervision in order to secure satisfactory completion of the SUBCONTRACTOR shall have the sole right to supervise, manage, control and direct performance of the Work by its employees and Sub-Subcontractors.

9.2.    OWNER and CONTRACTOR shall each be entitled to have its representative and agent present at all times during the progress of the Work to be performed thereunder, and SUBCONTRACTOR shall furnish free access to any Work to these representatives and agents at all times.

9.3.    SUBCONTRACTOR shall designate in writing to CONTRACTOR a representative for all matters arising under this Subcontract. SUBCONTRACTOR shall similarly designate its key personnel. Contractor shall have the right to approve said representative and key personnel; when so approved, they will not be changed without reasonable notice by SUBCONTRACTOR to CONTRACTOR, accompanied by a designation of successor personnel, who shall also be governed by the foregoing provisions. If during the course of Work, CONTRACTOR requests replacement of the representative or key personnel, SUBCONTRACTOR will designate a successor or successors, who shall also be governed by the foregoing provisions.

9.4.    Unless otherwise agreed in writing, SUBCONTRACTOR shall at its cost and expense arrange for and provide all utilities, labor, material, equipment, tools, transportation and other items necessary for performance of the Work, including but not limited to temporary electric power supply. SUBCONTRACTOR's Work is entirely at its own risk and expense.

9.5.    The Work will be subject to testing and inspection by CONTRACTOR and/or OWNER at all reasonable times and upon reasonable notice. SUBCONTRACTOR shall provide, and cause its Sub-Subcontractors to provide, adequate, safe and proper facilities for inspection by OWNER and CONTRACTOR and their representatives and at all times during work hours shall keep a competent superintendent in the immediate vicinity of the Work to receive communications from CONTRACTOR and to supervise the Work. SUBCONTRACTOR shall also provide all labor and materials necessary for the safe and convenient testing. Neither testing nor inspection by OWNER or CONTRACTOR or any representative or any payment shall be construed as and acceptance by CONTRACTOR or OWNER of any defective material or an approval or workmanship, nor shall any such testing, inspection or payment relieve or release SUBCONTRACTOR of any of its obligations, duties and liabilities under the terms of the Subcontract.

9.6.    CONTRACTOR has the right to engage other subcontractors in connection with the Project. SUBCONTRACTOR shall afford such others reasonable opportunities for the introduction

---

and storage of their materials and the execution of their work and shall properly coordinate its Work with theirs. If any part of the Work depends for proper execution upon existing work or work to be performed by others, SUBCONTRACTOR shall inspect and measure such other work and promptly report to CONTRACTOR if there are any discrepancies or defects therein which renders it unsuitable for proper execution of the Work. Failure of SUBCONTRACTOR to inspect and report any discrepancies or defects in such other work before performing its Work thereunder, which is dependent upon such other work, shall constitute an acceptance thereof by SUBCONTRACTOR.

9.7.   Upon request or if included in its Scope of Work, SUBCONTRACTOR shall provide at the site of the Project a sufficient number of suitable, qualified and experienced staff for advising and assisting CONTRACTOR in connection with trial operation.

9.8.   In the event that any Work performed by SUBCONTRACTOR thereunder is found by OWNER or CONTRACTOR to be faulty or of poor workmanship, or not in accordance with plans and specifications, or not in accordance with drawings previously approved by CONTRACTOR, then SUBCONTRACTOR shall, upon oral notice from CONTRACTOR, to be thereafter duly confirmed in writing, immediately cure such defects, at its own cost, so that its Work will be without fault and of workmanlike quality and will conform with such specifications or drawings. In the event such defects are not promptly cured, CONTRACTOR may, upon written notice to SUBCONTRACTOR, REQUIRE subcontractor to suspend all other parts of the Work until necessary corrections have been made, and SUBCONTRACTOR shall not be entitled to any payment or further payment until such corrections are made.

9.9.   If at any time prior to Final Acceptance of the Work it is discovered that any part of such Work may require correction, OWNER or CONTRACTOR shall have the right, without prejudice to any of OWNER's or CONTRACTOR's rights or remedies provided herein or by law, to use the same until such time as it is convenient to OWNER and CONTRACTOR that such part of the Work be removed from service for replacement or correction.

9.10. SUBCONTRACTOR's obligations under paragraphs 11 and 12 shall run in favor of, and be enforceable by, OWNER and CONTRACTOR or either of them.

## 10.  LIMITATION OF LIABILITY

10.1. In no event shall CONTRACTOR be liable under or for breach of this Subcontract to SUBCONTRACTOR, for any incidental, special or consequential damages, including but not limited to loss of profits or revenue, cost of capital, loss of sue or downtime cost, whether any such claimed liability is based on contract, tort (including negligence), strict liability or otherwise.

10.2. Contractor shall be entitled to consequential damages under the Subcontract only i) in case of default ii) in case of willful or grossly negligent act or omission, and/or iii) in connection with Article 15. Furthermore, with respect to consequential damages in connection with Article 15, where the priority date of claim date for underlying Article 15 right or claim ("Priority Date") is on or before Final Acceptance, SUBCONTRACTOR's liability shall not be limited by time; in contrast, in cases where the Priority Date is after Final Acceptance, any damages shall be limited in time to damages incurred and/or claims made during a time period ending five years after Final Acceptance, provided, SUBCONTRACTOR has supplied Contractor with

non-infringing substitute for the challenged product or process before the expiration of such five-year period.

## 11. CARE OF THE WORK

11.1. SUBCONRACTOR shall repair or replace any or all of the Work which is lost, damaged or destroyed before Final Acceptance of that Work. SUBCONTRACTOR shall bear the cost of this repair or replacement to the extent it exceeds the amount of proceeds received by CONTRACTOR in respect of the loss, damage or destruction under the Builder's Risk Insurance policy described in paragraph 13.5. Not withstanding the foregoing, SUBCONTRACTOR shall not be required to bear the cost or repairing or replacing any Work to the extent its loss, damage or destruction is proximately caused by the negligence of CONTRACTOR, OWNER or the other contractors or subcontractors of either of them.

11.2. SUBCONTRACTOR shall repair or replace any or all of the Work which is lost, damaged or destroyed after Final Acceptance but within the warranty period provided in paragraph 18. SUBCONTRACTOR shall bear the expense of such repair or replacement to the extent it is proximately caused by any act or omission of SUBCONTRACTOR or any of its Sub-Subcontract, without regard to whether such act or omission occurred before or after Final Acceptance.

11.3. Nothing contained in this paragraph 11 shall be deemed to limit SUBCONTRACTOR's warranty obligations as provided in paragraph 18.

## 12. LABOR HARMONY

SUBCONTRACTOR agrees that all labor employed by it, its agents, and/or SUBCONTRACTOR's for Work on the jobsite shall be in harmony with and be comparable with all other labor used by OWNER, CONTRACTOR or other Contractors.

## 13. CLEAN UP

SUBCONTRACTOR shall at all times keep its work area in a neat, clean and safe condition and remove from the OWNER's premises and the vicinity thereof and properly dispose of all debris and rubbish caused by SUBCONTRACTOR's operations. Upon completion of the Work, SUBCONTRACTOR shall promptly return unused materials furnished by OWNER or CONTRACTOR and remove from OWNER's premises all of SUBCONTRACTOR's equipment, material, scaffolding and like terms, leaving OWNER's premises and vicinity clean, safe and ready for use.

## 14.  SAFETY

14.1.  SUBCONTRACTOR shall be responsible for safety related to and during the prosecution of the Work, to protect the Work, workers, the public and all other people, OWNER's and CONTRACTOR's property and the property of third parties. Before starting installation work, SUBCONTRACTOR shall establish and publish all necessary health, fire and other safety regulations including installation methods and procedures. SUBCONTRACTOR shall obtain from CONTRACTOR all safety requirements of OWNER and CONTRACTOR and SUBCONTRACTOR's aforesaid regulations shall be modified as necessary to include these requirements.   SUBCONTRACTOR shall ensure that its employees and the employees of its Sub-Subcontractors are notified of and observe and abide by said regulations.

14.2.  SUBCONTRACTOR shall be responsible for and in direct control of the use of all lights and torches, forges and other fires required for the Work and shall provide suitable night lights.

## 15.  INSURANCE

SUBCONTRACTOR shall comply with the requirements as dictated by OWNER and laid out in the Purchase Order.

## 16.  INDEMNIFICATION

16.1.  SUBCONTRACTOR shall indemnify and hold harmless OWNER, CONTRACTOR and the agents and employees of both of them from and against any claim, damage, loss or expense, including but not limited to attorney's fees, arising out of or resulting from the performance of the Work, and attributable to bodily injury, sickness, disease or death, or damage to or destruction of property, including loss of use or consequential damage resulting therefrom but only to the extent caused in whole or in part by the negligent acts or omissions of the SUBCONTRACTOR,   the SUBCONTRACTOR's Sub-Contractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim damage, loss or expense caused in part by a party indemnified thereunder. This indemnification obligation shall include, but is not limited to, all claims against an indemnity by an employee or former employee of SUBCONTRACTOR.

16.2.  SUBCONTRACTOR shall require each Sub-Subcontractor to agree in writing to indemnify OWNER, CONTRACTOR and both of their agents and employees with respect to that Sub-Subcontractor's position of the Work to the same extent that SUBCONTRACTOR is required to indemnify those parties under paragraph 14.1 with respect to the SUBCONTRACTOR's Work.

# 17. PATENT INFRINGEMENT

17.1. If OWNER or CONTRACTOR is sued under any patent or patents on account of the alleged infringement thereof by SUBCONTRACTOR's use or any Sub-Subcontractor's use in performance of the Work, or OWNER's use in the Project or Plant, of any equipment, machinery, materials, compositions, processes or methods included in the Work which are not provided, designed or expressly specified by OWNER or CONTRACTOR, SUBCONTRACTOR agrees to defend such suit at SUBCONTRACTOR's own expense and will pay any damages and costs awarded against OWNER and/or CONTRACTOR in such suit. OWNER and CONTRACTOR shall each have the right to be represented in any such suit by advisory counsel of their own selection and at their own expense. Nothing herein shall authorize SUBCONTRACTOR to settle any such suit or action without prior written authorization by OWNER and CONTRACTOR if by such settlement either of them is obliged to make any monetary payment, to part with any property or any interest therein, to assume any obligation, to be subject to any injunction, or to grant any license or other right under any of its patent rights. If the use of any process, equipment or materials forming part of the Work is enjoined by any suit.

SUBCONTRACTOR at its own expense and at CONTRACTOR's option, either procure for OWNER and CONTRACTOR the right to continue using the same, or replace the same with a process, equipment or materials which are non-infringing, or modify the process, equipment or materials so that they are non-infringing, or remove the same and refund the purchase price thereof.

17.2. SUBCONTRACTOR shall obtain from each Sub-Subcontractor its written agreement in form satisfactory to CONTRACTOR to protect OWNER, CONTRACTOR all its subcontractors harmless against charges or claims of patent infringement arising out of the materials and equipment furnished by such Sub-Subcontractor and the use thereof by OWNER, CONTRACTOR or any of its subcontractors.

17.3. SUBCONTRACTOR agrees to grant and hereby grants to OWNER and CONTRACTOR immunity from suit under any patents owned or controlled, or hereafter to be owned or controlled, SUBCONTRACTOR or any of its Sub-Subcontractors which cover any apparatus, machinery, materials or composition of matter to be used or supplied thereunder or methods and processes to be practical or employed in the installation or operation as the Work, agrees to pay all royalties and license fees which may be due with respect thereto except as to equipment, machinery, materials or composition of matter supplied by OWNER or CONTRACTOR.

17.4. SUBCONTRACTOR, for itself and any of its Sub-Subcontractors, if license under any patents covering equipment, machinery, materials, or compositions of matter to be used or supplied thereunder or methods and processes to be practiced or employed in the installation or operation of the Work, agrees to pay all royalties and license fees which may be due with respect thereto except as to equipment, machinery, materials and composition of mater supplied by OWNER or CONTRACTOR.

---

17.5. If any individual piece of equipment, machinery, materials or composition of matter to be used or supplied thereunder is covered by a patent or patents under which SUBCONTRACTOR or any of its Sub-Subcontractors is not licensed, SUBCONTRACTOR for itself or such Sub-Subcontractor agrees to pay any and all royalties and license fees that may be assessed thereon, except as to equipment, machinery, materials and compositions of matter supplied by OWNER or CONTRACTOR.

## 18. SUBCONTRACT PRICE

The Subcontract Price (specified in the Signature document of this Subcontract) is firm and is not subject to renegotiations if costs of SUBCONTRACTOR increase because of increases in price by suppliers of material and equipment due to increases in wage rates and/or material costs; increases in wage rates; or for any other reason whatsoever. It may be changed only as provided in paragraph 3. Payment shall be made as provided in the Purchase Order.

## 19. MECHANICAL COMPLETION AND FINAL ACCEPTANCE OF THE WORK

19.1. SUBCONTRACTOR shall notify CONTRACTOR in writing when in SUBCONTRACTOR's judgement, the Work is Mechanically/Electrically Complete. CONTRACTOR shall then inspect the Work and SUBCONTRACTOR shall conduct the testing required to establish Mechanical Completion in the presence of the representatives of CONTRACTOR and/or OWNER. SUBCONTRACTOR shall, at its own expense, provide the equipment, material and technical personnel and other labor necessary to conduct such test.

19.2. CONTRACTOR shall, within five (5) days of completion of the inspection and mechanical testing, specify in writing any particulars in which the Work is not Mechanically Complete. SUBCONTRACTOR, at its expense, shall promptly and with due diligence make the necessary corrections to make the Work Mechanically Complete. When all deficiencies are corrected and the Work is, in CONTRACTOR's judgement, Mechanically Complete, CONTRACTOR will issue to SUBCONTRACTOR a notice of Mechanical Completion of the Work.

19.3. When in SUBCONTRACTOR's judgement all of Work is completed, SUBCONTRACTOR shall give written notice to CONTRACTOR. CONTRACTOR shall, within five (5) days following receipt of such notice, either (a) specify in writing the items, if any, requiring completion before Final Acceptance shall occur, or (b) acknowledge such notice without specifying any items requiring completion. If CONTRACTOR so specifies any such item requiring completion, SUBCONTRACTOR shall, at its cost and expense, promptly and diligently complete the item so specified, and, thereafter again notify CONTRACTOR. If CONTRACTOR agrees, it shall promptly thereafter issue to SUBCONTRACTOR a notice of Final Acceptance.

**20.    SUBCONTRACTOR'S PERFORMANCE GUARANTEE AND WARRANTY**

20.1    SUBCONTRACTOR warrants to OWNER and CONTRACTOR that all Work will be performed in a firs-class substantial and workmanlike manner and to the satisfaction of OWNER and CONTRACTOR. All materials shall be new and of the kind and quality specified. Whenever quality is not specified, materials shall be of first quality and suitable to the Work intended. The design, arrangement of equipment and details of installation shall conform to modern practices.

20.2    SUBCONTRACTOR warrants to OWNER and CONTRACTOR all machinery, materials and equipment supplied by it or by any of its Sub-Subcontractors as a part of the Work against any defect or failure in normal usage for a period of two (2) years from the date of Final Acceptance of the entire Project. SUBCONTRACTOR will repair and cure all such defects and failures as become evident during the warranty period set forth in this paragraph and which are reported to it by OWNER or CONTRACTOR within a reasonable time after discovery. If SUBCONTRACTOR is unable for any reason promptly to repair and cure any such defect or failure it will promptly and at its own expense replace all such materials and equipment as are necessary to sure such defect or failure. The foregoing warranty provisions shall also apply to all repaired or replaced materials, parts and equipment.

20.3    Should SUBCONTRACTOR fail promptly to make the repair or replacement necessary to cure the defect or failure, OWNER or CONTRACTOR may do the same or cause it to be done so by third parties in such a manner as OWNER or CONTRACTOR may consider appropriate, and the cost and expenses incurred therefore shall be reimbursed by SUBCONTRACTOR or, at CONTRACTOR's option, deducted from any monies due or to become due to SUBCONTRACTOR.

20.4    SUBCONTRACTOR will obtain from each of its Sub-Subcontractors guarantees and warranties, in the same terms as provided in paragraphs 20.1, 20.2, 20.3 and 20.4 on all machinery, materials and equipment purchased and supplied by the Sub-Subcontractor, or if unable to do so, shall obtain CONTRACTOR's prior written approval of such guarantees and warranties as are obtained. All such guaranties and warranties as are obtained shall inure to the benefit of OWNER and CONTRACTOR.

## 1. SUBCONTRACTOR'S RECORDS

SUBCONTRACTOR shall furnish waivers of lien with every invoice per example provided as ANNEX 3. CONTRACTOR shall have the right at all reasonable times during normal business hours to inspect all books and accounting records and its Sub-Subcontractors relating to the Work for the purpose of verifying progress of and charges to the Work.

## 22. CLAIMS AND LIENS FOR LABOR AND MATERIAL

As a condition of Final Acceptance, SUBCONTRACTOR shall submit to CONTRACTOR an executed Lien Waivers Declaration stating that it has compiled with the obligations of this paragraph. SUBCONTRACTOR agrees to pay and satisfy all claims for labor and materials employed or used in any way by it or any Sub-Subcontractor in connection with the Work and to permit no liens of any kind to be fixed upon the land upon which the Project is situated, or the Project, by laborers, mechanics, warehousemen or materialsmen employed in connection with the Work performed thereunder, or material supplied by its vendors furnishing material to be incorporated in the Work, or others, and SUBCONTRACTOR agrees to indemnify, protect, and save OWNER and CONTRACTOR harmless from and against all such claims and Liens. Without relieving SUBCONTRACTOR shall cause its Sub-Subcontractor to assume the same responsibility as provided herein above.

## 3. DEFAULT

23.1    SUBCONTRACTOR shall be in default of this Subcontract one (1) days after a written 24 Hour notice from CONTRACTOR to that effect if SUBCONTRACTOR:

a) Fails to comply strictly with any of the terms or provisions of this Subcontract, except to the extent compliance is delayed or prevented for any of the causes set out in paragraph 25 hereof; or

b) Shall become insolvent, enter voluntary or involuntary bankruptcy or receivership proceedings or make an assignment for the benefit of creditors; or

c) Fails diligently to undertake or prosecute the Work to be done thereunder or fails to supply sufficient labor or materials to complete the Work within the period herein specified, except to the extent such failure is due to any of the causes set out in paragraph 25, hereof.

23.2    SUBCONTRACTOR is in default of this Subcontract, CONTRACTOR shall have the right (without limiting any other rights or remedies it may have thereunder or by operation of law) to terminate this Subcontract and thereupon CONTRACTOR shall be released of all further obligations thereunder, except the obligation to make payment on account of any Work therefore done by SUBCONTRACTOOR and not yet paid for; without prejudice to the foregoing, CONTRACTOR shall have no obligation to make any payment for any of SUBCONTRACTOR's costs or expenses occasioned by such termination.

In addition to such right to terminate this Subcontract, and whether or not it shall exercise such right ( and without limiting any other rights or remedies it may have hereunder or by operation of law), CONTRACTOR shall have the further right in the event of SUBCONTRACTOR's default to take over form SUBCONTRACTOR all part of the remaining Work covered by this Subcontract and perform and complete the same or cause the same to be performed and completed, and the cost of such performance and completion shall be paid from the portion of the Subcontract Price not paid to SUBCONTRACTOR prior to the time said Work shall be taken over form SUBCONTRACTOR. If the cost of such performance and completion by CONTRACTOR shall exceed such unpaid portion of the Subcontract Price, SUBCONTRACTOR shall reimburse CONTRACTOR for all costs in excess thereof.

## 24.    SUBCONTRACTING AND ASSIGNMENT

24.1    The Work hereunder shall be performed by SUBCONTRACTOR and shall not be subcontracted, nor shall SUBCONTRACTOR assign its rights or obligations, or any sums that may accure to it hereunder, without the written consent of CONTRACTOR first having been obtained; and not written permission by CONTRACTOR to subcontract any portion of the Work or to assign SUBCONTRACTOR's rights or obligation thereunder shall in any way affect SUBCONTRACTOR's obligation to CONTRACTOR thereunder properly to perform all of its obligations relating to the Work in accordance with this Subcontract.

24.2    Each of SUBCONTRACTOR's contracts with each of its Sub-Subcontractors shall require the Sub-Subcontractor, (a) with respect to that portion of the entire Work to be performed by the Sub-Subcontractor, to assume toward the SUBCONTRACTOR all the obligations and responsibilities which the SUBCONTRACTOR, by this Subcontract, assumes toward the CONTRACTOR; and (b) to require each of its Sub-Subcontractors of any tier, with respect to the portion of entire Work to be performed by it to assume toward SUBCONTRACTOR all the obligations and responsibilities which the SUBCONTRACTOR by this Subcontract assumes toward the CONTRACTOR.

24.3    Nothing herein contained shall in any way limit OWNER's or CONTRACTOR's power to assign its right under this Subcontract.

24.4    The obligations of SUBCONTRACTOR and those to be undertaken by its Sub-Subcontractors, as provided in this paragraph 24 shall run in favor of, and be enforceable by, OWNER and CONTRACTOR, or either of them.

## 25. FORCE MAJEURE

25.1    Any delays in or failure of performance of either party hereto shall not constitute default thereunder or give rise to any claims for damages if and to the extent such delays or failure of performance are caused by occurrences beyond the control of the party affected including, buy not limited to: acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or decree of any governmental authority, acts of war, abnormal weather, rebellion or sabotage or damage resulting therefrom, fires, floods, explosion, riots, strikes or other concerted acts of workmen other than those employed by SUBCONTRACTOR or any Sub-Subcontractor; provided that any such delay or failure is not within the control of the party affected, and against which said party is unable to provide by the exercise of reasonable diligence.

25.2    Should SUBCONTRACTOR be delayed in prosecution of the Work by an occurrence it feels is force majeure as specified above and SUBCONTRACTOR cannot avoid or prevent said delay by any reasonable effort, SUBCONTRACTOR shall promptly give notice to CONTRACTOR and if it agrees, CONTRACTOR will then give notice to SUBCONTRACTOR confirming the existence of force majeure and, if an equitable adjustment is required, will authorize a change in the Scheduled date of Final Acceptance.

## 26. TERMINATION FOR CONVENIENCE

CONTRACTOR shall have the right at any time to terminate this Subcontract by notice in writing to SUBCONTRACTOR. Upon receipt of any such notice, SUBCONTRACTOR will cease all Work under this Subcontract and this Subcontract shall terminate effective as of the date such notice is receivable by SUBCONTRACTOR. Should CONTRACTOR elect to terminate this Subcontract under the provisions of this paragraph, CONTRACTOR shall make payment to SUBCONTRACTOR in consideration of all Work theretofore done by SUBCONTRACTOR and not yet paid for plus all cancellation charges, if any, incurred on equipment on which orders have been place, such payment to be made subject to and in accordance with all of the terms and provisions hereof applicable to the final payment of the Subcontract Price.

## 27. SUSPENSION OF WORK

27.1    In addition to CONTRACTOR's rights to stop or suspend any part of the Work or all remaining Work pursuant to paragraphs 9.9 and 26 hereof, CONTRACTOR may, at any time, suspend all or any part of the remaining Work for any reason whatsoever by giving notice to SUBCONTRACTOR specifying the part of the Work to be suspended and the effective date of suspension. SUBCONTRACTOR shall continue to prosecute any unsuspended part of the Work. Suspension shall not limit or waive SUBCONTRACTOR's responsibility thereunder.

27.2    If part or all of the remaining Work is suspended, it shall be deemed to constitute a change in the Work and payments to the SUBCONTRACTOR shall be adjusted to

account for increases or decreases in costs to SUBCONTRACTOR in accordance with paragraph 3.

27.3    CONTRACTOR may, at any time, direct resumption of all or any part of the suspended Work by giving notice to SUBCONTRACTOR specifying the part of the Work to be resumed and the effective date of suspension withdrawal. Suspended Work shall be promptly resumed by SUBCONTRACTOR after receipt of such notice.

## 28.    DELAY IN COMPLETION

No extension of time for Substantial Completion and Final Acceptance of the Work shall be valid unless it is given in writing by CONTRACTOR. If SUBCONTRACTOR fails to finish and complete the Work in all parts and in accordance with all requirements by the Scheduled Date of Final Acceptance stipulated in the Signature Document of this Subcontract, plus any extension of time granted because of unavoidable delay and any allowed in connection with any authorized change, SUBCONTRACTOR shall be in default in the performance of its obligations thereunder. Without prejudice to any other right or remedy it may have if no amount of liquidated damages is provided for in the Signature Document, CONTRACTOR shall then be entitled to charge SUBCONTRACTOR and may deduct from any payment otherwise due SUBCONTRACTOR, or on demand of CONTRACTOR, SUBCONTRACTOR shall pay to CONTRACTOR, the amount of liquidated damages specified in the Signature Document for the work after the date so stipulated as so adjusted.

## 29.    POSSESSION PRIOR TO OWNERSHIP TRANSFER

All materials, equipment and Work shall become the sole property of the Owner upon Final Acceptance of the entire Project, or upon SUBCONTRACTOR's receipt of final payment from CONTRACTOR, whichever occurs first. CONTRACTOR and/or OWNER, including its agent, shall have the right to move into SUBCONTRACTOR's working areas and the right to take possession of or use any completed or partially completed part of SUBCONTRACTOR's Work as CONTRACTOR and OWNER deems necessary for their operations. Such possession or use shall not constitute acceptance of SUBCONTRACOR's Work.

## 30.    PUBLICITY

30.1    No reference to OWNER or CONTRACTOR may be made by SUBCONTRACTOR either before or after completion of the Work, for publication for advertising purposes without the prior written consent of CONTRACTOR/OWNER.

30.2    No photographs may be taken of the Project or any portion thereof without the prior written consent of the CONTRACTOR/OWNER.

---

1.  **COMPLIANCE WITH LAWS**

This Subcontract is made subject and applicable to all laws, rules and regulations of constituted governmental authority, and SUBCONTRACTOR agrees to comply, and be responsible for compliance by its Sub-Subcontractors, with all such laws, rules, and regulations. If SUBCONTRACTOR observes that any portion of the Work is at variance therewith in any material respect, it shall promptly notify CONTRACTOR in writing.

32.  **TAXES, DUTIES AND FEES**

32.1  SUBCONTRACTOR shall be fully and exclusively responsible for payment of all taxed, duties, fees and assessments of whatsoever nature imposed by governmental authorities and applicable to the performance of the Work, except for sales and use taxes assessed by any governmental authority on material, machinery and equipment supplied by SUBCONTRACTOR and used in the performance of the Work.

32.2  If required by applicable sales or use tax laws and if expressly so provided elsewhere in this Subcontract, CONTRACTOR will pay over to SUBCONTRACTOR for remittance to the appropriate authorities all applicable sales and use taxes properly payable. All such taxes shall be added to the invoices of SUBCONTRACTOR submitted to CONTRACTOR and shall be paid by CONTRACTOR to SUBCONTRACTOR concurrently with the payments on such invoices. CONTRACTOR and SUBCONTRACTOR agree to minimize such tax liability to the fullest extent possible under applicable law, including without limitation, applying for any and all deferrals and exemptions available under applicable law, CONTRACTOR and SUBCONTRACTOR agree to cooperate in contesting the imposition of any such taxes in the event that CONTRACTOR shall determine to contest the same. Any such contest such tax liability shall be borne by CONTRACTOR.

33.  **DISPUTE RESOLUTION; JURISDICTION AND VENUE; GOVERNING LAW**

33.1  CONTRACTOR and SUBCONTRACTOR shall use their best efforts to settle all disputes between them by negotiations in good faith.

33.2  Should it become necessary for any party to this Contract to seek the assistance of legal counsel to enforce any part of this Subcontract or to maintain or defend any cause of action or arbitration arising out of this Contract, venue is agreed to be in Chicago, Illinois, and the prevailing party shall be entitled to recover from the losing party all costs and expenses reasonably incurred, including, but not limited to, attorney's fees.

## 4.    INTERPRETATION

34.1    This Subcontract is entered into under, and shall be construed and interpreted according to, the laws of the State in which the site of the Project is located.

34.2    This Subcontract contains the entire understanding of the parties and, except for any prior agreement between the parties concerning the confidentiality of, and/or the license of any proprietary information or trade secrets, supersedes all oral or written representations or agreements concerning the matters with which the provisions of this Subcontract are concerned; and subject to the provisions of paragraph 3 of these General Conditions, it shall not be modified except by an agreement in writing signed by both parties.

34.3    Paragraph captions are provided for convenience of reference and shall not affect the interpretation of the provisions of this Subcontract.

34.4    The waiver by either party of any breach by the other of any provision of this Subcontract, or the failure of either party to invoke or enforce any right which it has under this Subcontract, shall not be deemed a waiver for future compliance with any such provision of this Subcontract or of the right to enforce any such right, and such provision and rights as well as all other provisions and rights in this Subcontract shall remain in full force and effect.

34.5    Except for those set forth in paragraph 33, the duties and obligations imposed by this Subcontract and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed thereunder or available by law.

34.6    Subject to the terms and provisions of this Subcontract, the benefits and burdens of this Subcontract shall inure to the benefit, and be binding upon, the successors and assigns of the parties.

34.7    If any term or provision hereof shall be determined to be invalid by a court of competent jurisdiction, such invalidity shall not extend to any other term or provision of this Subcontract.

FOR THE CONTRACTOR:                          FOR THE SUBCONTRACTOR:

**EISENMANN CORPORATION**                    _____

_____              _____
            BY                                          BY

_____              _____
           TITLE                                       TITLE

_____              _____
           DATE                                        DATE

## 5. FIELD PURCHASE ORDER PROCEDURE

Field Purchase Orders (Exhibit "A:) are used to enable Field Representatives the flexibility to adapt to changing project conditions and to keep home office engineering, purchasing, and accounting fully informed as to specification and schedule changes and cost impact. Therefore, whenever a situation arises in the field that results in either out of scope work, back charges, or Contract changes, a Field Purchase Order must be issued to our Contractor **before** work is performed. This form must be executed completely and accurately.

The proper procedure for issuing an ENC Field Purchase Order is as follows:

1. Complete Vendor name and address
2. Purchase Order Number
3. Date Issued
4. Customer name
5. Customer Reference No. (if applicable)
6. Description – This section must be completed in as much detail as possible to eliminate any possible misunderstanding concerning the scope of work. Please give a drawing number with a notice of error card on it.
7. Agreed upon Contract price
8. Illinois Resale No. (no tax)
9. Terms and Conditions
10. Delivery and/or completion
11. Site location
12. Reason for request -- should be explained
13. Field Representative signature
14. Purchasing signature if over $1,000.000 (verbal is acceptable)
15. Whom this is ordered for
16. Contractor signature accepting the Contract
17. Field Representative signature after work is completed, send in with your pink acknowledgement and invoice. No payment with number 17.
18. Purchasing approval

## 36.    SPECIAL ORDER FORM

### EXHIBIT "A"

| SPECIAL ORDER FORM<br>☐ PURCHASE ORDER<br>☐ ORDER CONFIRMATION<br><br>TO:<br><br><br><br>CONTACT:<br>PHONE:<br>FAX: | EISENMANN CORPORATION<br>150 EAST DARTMOOR DRIVE<br>CRYSTAL LAKE, IL 60014<br>PHONE (815) 455-4100<br><br>ORDER INITIATE BY: |
|---|---|

| PURCHASE ORDER NO. | **AXX-XXX-XXX-XXX** |
|---|---|
| ORDER DATE:          DATE PROMISED:<br>SHIP VIA:<br>CUSTOMER | |

| ITEM | QTY. | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

SHIP TO:                                             PHONE:   SITE TEL. No.:

| Reason for Order:<br>☐ Customer Request<br>☐ Supplier Error<br>☐ Engineering Rev. (Note on B/M<br>☐ Shop Revision<br>☐ Drawing or Bill of Mat'l Number | ☐ Field Extra<br>☐ Warranty<br>☐ Shipping Damage<br>☐ Other - | Bill Costs To:<br>☐ Customer<br>☐ Supplier<br>☐ EISENMANN Position _____<br><br><br>(Request Signature) |
|---|---|---|

| Approved:<br>Supervisor<br><br>Purchasing | Supplier Acknowledgment<br>Name:<br><br>Date: |
|---|---|
| Work Completed Satisfactorily: | Approved for Payment: |
| EISENMANN Representative | Purchasing |

Terms and Conditions are the same as existing contracts, unless otherwise stated.

SUPPLIERS PLEASE NOTE: A copy of this order must accompany all related invoices. IL. RESALE #1561-04

**All products shall be absolutely FREE of SILICONE**

EISENMANN CORPORATION                                                 Page 22
C:\Documents and Settings\chiarf\Local Settings\Temporary Internet Files\OLK2D\Eisenmann General Terms 8-00.doc

**7.    COMPOSITE LABOR RATES        EXHIBIT "R"**

**CONTRACTOR:** _____    **DATE:** _____

Composite labor rates include tool allowance, supervision, fringe benefits, overhead and profit, insurance and taxes, means, on-site supervision, out-of-town living expenses and contractor's handling fees. These rates to be applicable to additions to or deletions from the work not covered by unit pricing and shall be valid for the duration of the contract period.

| LABOR RATE | STRAIGHT TIME | FIRST SHIFT | SECOND SHIFT | TIME & 1/2 | DOUBLE TIME |
|---|---|---|---|---|---|
| Mechanical Engineer | | | | | |
| Electrical General Foreman | | | | | |
| Field Engineer | | | | | |
| Field Supervisor | | | | | |
| Millwright | | | | | |
| Millwright Foreman | | | | | |
| Iron Worker | | | | | |
| Iron Worker Foreman | | | | | |
| Electrician | | | | | |
| Electrician Foreman | | | | | |
| Pipe Fitter | | | | | |
| Pipe Fitter Foreman | | | | | |
| Sheet Metal | | | | | |
| Sheet Metal Foreman | | | | | |
| Rigger | | | | | |
| Rigger Foreman | | | | | |
| Operator | | | | | |
| Laborer | | | | | |
| Carpenter | | | | | |
| Carpenter Foreman | | | | | |
| Finisher | | | | | |
| Cement Mason | | | | | |
| Cement Mason Foreman | | | | | |
| Insulator | | | | | |
| Insulator Foreman | | | | | |
| Painter | | | | | |
| Painter Foreman | | | | | |
| | | | | | |

**EISENMANN CORPORATION**

38.    **INVOICING PROCEDURES**

### EXHIBIT "I"

- Attached sworn statement and applicable waiver form must be submitted with each invoice.

- If there are no subcontractors working for you, submit sworn statement noting that there are no subs.

- Invoices are to be signed by Eisenmann Project Manager on site, prior to submitting for payment. A project walk through will be held before the 20th of every month and submitted to Eisenmann, with signature, by the 25th in order for it to be processed that month.

- Invoice must state amount complete to date less 10% retention. 10% retention will be withheld on every invoice.

- If contract payment terms include a discount for early payment, the discount period starts at date of receipt at Eisenmann, Crystal Lake.

Please note, if invoices are not submitted as requested they will be returned for correction.  Upon receipt of corrected invoices, payment terms will begin at receipt date.

---

**EISENMANN CORPORATION**                                                                    **Page 24**

# EXAMPLE

## EXHIBIT "S"

### CONTRACTOR'S SWORN STATEMENT

To whom it may concern:

The undersigned, (Name) <u>Jane Doe</u> being duly sworn, deposes and says that he or she is (position) <u>President</u> of (Company name) <u>AA Electrical Contracting</u> who is the contractor furnishing <u>Electrical Installation</u> owned by <u>G & H Electric Inc.</u> That the total amount of the contract including extras is $<u>200,000</u> on which he or she has received payment of $ <u>100,000</u> prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defect the validity of said waivers. That the following are the names and addresses of all parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| Name of Contractor | Type of Improvement Furnished | Contract Price Including Extras | Amount Previously Paid | Pay this request | Contract Balance |
|---|---|---|---|---|---|
| XYZ Co. | Electrical components | $75,000 | $25,000 | $50,000 | 0 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS TO COMPLETE | | | | $50,000 | 0 |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

☐  We do not have any subcontractors on this project.

DATE _____    SIGNATURE _____

Subscribed and sworn to before me this _____ day of _____, 20___.

_____
Notary Public

## EXHIBIT "S"

## CONTRACTOR'S SWORN STATEMENT

To whom it may concern:

The undersigned, (Name) _____ being duly sworn, deposes and says that he or she is (position) _____ of (Company name)    _____
_____ who is the contractor furnishing _____
_ owned by _____
_____That the total amount of the contract including extras is $_____ on which he or she has received payment of $ _____ prior to this payment.  That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defect the validity of said waivers.  That the following are the names and addresses of all parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| Name of Contractor | Type of Improvement Furnished | Contract Price Including Extras | Amount Previously Paid | Pay this request | Contract Balance |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

☐  We do not have any subcontractors on this project.

DATE _____    SIGNATURE _____
Subscribed and sworn to before me this        _____ day of _____
_, 20____.

_____
Notary Public

# EXHIBIT "WP"

## PARTIAL WAIVER OF LIEN

Owner's/Lessee's Contract –                                **DATE:**
           **EN JOB #**

Owner's/Lessee's Business Unit –
Premises Location –

Party Waiving Lien -
          Address _____
          Address _____

Role (Check One)

☐ Prime Contractor      ☐ Construction Manager      ☐ Subcontractor
☐ Materialman          ☐ Laborer                 ☐ Consultant
☐ Architect/Engineer

Payment to be received from - **Eisenmann Corporation**

Description of Services –

## Accumulated Payment Amount  $

The undersigned, being duly authorized by the party waiving the lien, acknowledges accumulated payment amount as consideration and satisfaction for furnishing material, labor or services for construction of the named premises location and by signing this partial waiver of lien does waive, surrender and release any and all partial, claim or right of lien (asserted or unasserted) to the date of this Waiver of Lien.

The undersigned covenants that all documents requested by the Owner/Lessee to effectuate this partial waiver of lien shall be executed.

AUTHORIZED PERSON

    Signature          _____

    Name (Print or Type)    _____

    Capacity (Print or Type)   _____

    Date                _____

#1 Original - Record of Owner/Lessee

#2 Copy   - Records of EISENMANN CORPORATION

#3 Copy   - Records of   _____

# EXHIBIT "WF"

## FINAL WAIVER OF LIEN

Owner's/Lessee's Contract –                          **DATE:**

**EN JOB #**

Owner's/Lessee's Business Unit –
Premises Location –

Party Waiving Lien -

Address _____

Address _____

Role (Check One)

☐ Prime Contractor          ☐ Construction Manager          ☐ Subcontractor
☐ Materialman              ☐ Laborer                       ☐ Consultant
☐ Architect/Engineer

Payment to be received from - **Eisenmann Corporation**

Description of Services –

## Accumulated Payment Amount  $

The undersigned, being duly authorized by the party waiving the lien, acknowledges accumulated payment amount as consideration and satisfaction for furnishing material, labor or services for construction of the named premises location and by signing this final waiver of lien does waive, surrender and release any and all lien, claim or right of lien (asserted or unasserted) to the date of this Waiver of Lien.

The undersigned covenants that all documents requested by the Owner/Lessee to effectuate this final waiver of lien shall be executed.

**FINAL WAIVER MUST BE SIGNED, NOTARIZED AND RETURNED TO EISENMANN BEFORE PAYMENT WILL BE EXECUTED!!**

AUTHORIZED PERSON

Signature          _____

Name (Print or Type)   _____

Capacity (Print or Type)  _____

Date             _____

#1 Original - Record of Owner/Lessee

#2 Copy    - Records of EISENMANN CORPORATION

#3 Copy    - Records of _____

# EISENMANN

770-446-2401                                                    HMMA-FA

## CHANGE ORDER # _01_

## DATE _3/26/04_

**PURCHASING**

MAR 26 2004

**FAXED**

| | | | |
|---|---|---|---|
| IPF AMERICA, INC. | 4586 | Buyer : | MR. BOB KELLER |
| | | Phone : | 815-477-5316 |
| 6611 BAY CIRCLE | | Fax : | 815-356-2586 |
| NORCROSS, GEORGIA, 30071 | | Date : | 03/26/04 |

PURCHASE ORDER NO. 071951-BK /A36-2113/0002

This order is subject to the terms and conditions on reverse side.

IN ORDER FOR PROMPT PAYMENT OF INVOICES PLEASE PROVIDE FREIGHT BACKUP
DOCUMENTATION FOR ALL SHIPMENT IN EXCESS OF $100.00

ALL PRODUCTS SUPPLIED BY OUR VENDORS SHALL BE YEAR 2000 CERTIFIED, IF
APPLICABLE.

ILLINOIS TAX ID NUMBER:  1561-5804

Shipping Address:       HMMA HYUNDAI MOTOR MFG.  AL

                        ATTN: EISENMANN JOBSITE
                        1280 TEAGUE ROAD
                        MONTGOMERY, AL, 36105

| ine | Quantity | UM | Description | Surcharge/Discount | Price |
|---|---|---|---|---|---|
| | | | Delivery Arrival        : 06/30/04 | | |
| | | | Our Item No       : 9899 | | |
| 1 | 1 | EA | IPF EQUIPMENT FOR HYUNDAI | US$/ EA | 26198162.00 |
| | | | GENERAL ASSEMBLY: | | |
| | | | Cust.Tran.Line : A36-2113   / 0002 | | |

***** Page    2 follows *****

# EISENMANN

PURCHASE ORDER NO. 071951-BK /A36-2113/0002

Date  : 03/26/04
Page  :        2

| Line | Quantity UM | Description | Surcharge/Discount | Price |
|------|-------------|-------------|--------------------|-------|

ALL PRODUCTS SHALL BE ABSOLUTELY FREE OF SILICONE
AND SHALL BE PAINT-COMPATIBLE!

Notify EISENMANN 2 days prior to delivery.  All deliveries must arrive before 12:00 PM.

*Robert J. Hill*

EISENMANN Corporation

26,198,162.00

# EISENMANN

December 19, 2003

IPF America, Inc.
6611 Bay Circle
Suite 100
Norcross, GA  30317
Attn.: Mr. Martin Stuckhardt, President.

**Re:**  **Hyundai Final Assembly Line.  Our Order # 36-2113.**
**Purchase Order to IPF # 71951-BK**

Dear Mr. Stuckhardt:

This letter serves to document our formal purchase order  # 71951-BK to your company for equipment and services for the General Assembly Line at the Hyundai plant in Montgomery, Alabama.

The IPF Scope of Supply is turn-key to the end user Hyundai Motor Manufacturing, Alabama, LLC, (HMMA) in terms of both <u>functionality</u> and <u>equipment</u> / <u>services</u>, and shall adhere to all HMMA specifications as outlined in four (4) volumes labeled "Hyundai Technical Contract Specifications", presently in IPF's possession.  IPF's acceptance of this order also represents unconditional acceptance of HMMA, Montgomery, Alabama Equipment Contract General Terms and Conditions of the Contract (Part I & II and attachment) as signed by HMMA and EISENMANN on May 22, 2003, all of which is contained in copy as attachment.  The split of scope of Supply between EISENMANN and IPF America is further delineated in *attachment 1* Split of scope of supplies and services, Hyundai,  EISENMANN, and IPF. You shall adhere to the schedules as agreed upon with HMMA especially to:

| | |
|---|---|
| Equipment Tryout Start: | April 1, 2004 |
| Pilot Operation Start by HMMA: | June 1, 2004 |
| Start of Production (NF Model): | March 1, 2005 |
| Start of Production (CM Model): | Jan. 2, 2006 |

**EISENMANN Corporation**
**150 East Dartmoor Drive • Crystal Lake, Illinois 60014**
**Phone: (815) 455-4100 • Fax (815) 455-1018**
**www.eisenmann.com**

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\Contract_IPF-America\loc_Dec19-2003_HJB.doc

# EISENMANN

For the sake of good and proper proceeding IPF and EISENMANN agreed on installation begins for key equipment as further detailed in *attachment 2*.

The only exceptions to the above contract between EISENMANN and HMMA are payment terms and bonding requirements.  IPF shall be responsible for any liquidated damages for late delivery and consequential damages that arise form the responsibility of IPF.  In addition, EISENMANN Terms of Contract 3/200 shall apply.  In the event of conflict with HMMA General Terms and Conditions, HMMA T&C shall have precedence.

### Total Lump Sum Price: US$ 26,198,162.---

according to *attachment 3a*, all freight, duties and taxes are included; payable in monthly progress payments, based on 90% of supplied value with the remaining 10% retainage to be paid upon completion of Final Acceptance of NF model by HMMA and EISENMANN, all thirty (30) days net.

**NOTE:**  Above price is a turn-key price.  No extra charges or price changes are allowed except as specifically authorized by Hyundai under the change proposals and change order procedures in the contract in *attachment 5*. The current status of these changes is included in *attachment 3b* hereunder.  Any agreed price adjustments shall be made at time of the final retainage payment unless otherwise agreed upon in writing.

Payments to be made by EISENMANN under the detailed payment schedule according to *attachment 4* shall be subject to acceptance of invoices.

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\Contract_IPF-Americas_Dec19-2003_HJB.doc

# EISENMANN

**SPECIAL CONDITIONS:**

ALL WORK SHALL BE EXECUTED AND INSPECTED IN ACCORDANCE WITH ALL LOCAL, REGIONAL, STATE AND FEDERAL LAWS, ORDINANCES, RULES, REGULATIONS, EQUIPMENT MANUFACTURERS SPECIFICATIONS, ZONING AND BUILDING BY-LAWS. HMMA AND THE OWNERS SPECIFICATIONS APPLICABLE TO THIS CLASS OF WORK. THE CONTRACTOR SHALL PAY ANY FEES IN CONNECTION WITH SUCH INSPECTIONS.

THE LATESTS ISSUE OF CODES AND STANDARDS OF THE FOLLOWING ORGANIZATIONS SHALL BE CONSIDERED AS A MINIMUM REQUIREMENT FOR THE PROJECT. REFER ALSO TO THE HYUNDAI MOTOR MANUFACTURING GENERAL SPECIFICATIONS

ANSI – AMERICAN NATIONAL STANDARDS INSTITUTE
NEC – NATIONAL ELECTRICAL CODE
NFPA – NATIONAL FIRE PROTECTION ASSOCIATION
IEC – INTERNATIONAL ELECTROTECHNICAL COMMISSION
ISO – INTERNATIONAL ORGANIZATION FOR STANDARDIZATION
OSHA – OCCUPATIONAL SAFETY AND HEALTH ACT
EPA – ENVIRONMENTAL PROTECTION ASSOCIATION
ASTM – AMERICAN SOCIETY OF TESTING MATERIALS
ASME – AMERICAN SOCIETY OF MECHANICAL ENGINEERS
AWS – AMERICAN WELDING SOCIETY
AISC – AMERICAN INSTITUTE OF STEEL CONSTRUCTION
UL – UNDERWRITERS LABORATORIES, INC.
FM – FACTORY MUTUAL ASSOCIATION
NEMA – NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION
IEEE – INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS
GISO – GENERAL INDUSTRY SAFETY ORDERS
ASHRAE – AMERICAN SOCIETY OF HEATING, REFRIGERATION AND AIR CONDITIONING ENGINEERS
JIC – JOINT INDUSTRIAL COUNCIL
IES – ILLUMINATION ENGINEERING SOCIETY
IPECA – INSTITUTE POWER CABLE ENGINEERS ASSOCIATION
SAE – SOCIETY OF AUTOMOTIVE ENGINEERS
NECA – NATIONAL ELECTRIC CONTRACTORS ASSOCIATION
IRI – INDUSTRIAL RISK INSURERS
NESC – NATIONAL SAFETY ELECTRICAL SAFETY CODE

ATTENTION SHALL BE GIVEN IN PARTICULAR TO THE FOLLOWING CODES AND PARAGRAPHS: ANSI B11, 19, 20 AND 30, ANSI R1A 15.06, NFPA 79, SAE HS 1738

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\Contract_IPF-Americalec_Dec19-2003_HJB.doc

# EISENMANN

Please document your acceptance of this purchase order by signing at the space provided below.

Sincerely yours,

EISENMANN CORPORATION

*Herbert J. Buder*

Herbert J. Buder
Vice President
Finance and Administration

*seen: G. Connert*

Accepted: _____ *AKaouch*

for IPF America, Inc.

Date: _06. Jan. 2004_

## Attachments:

| | |
|---|---|
| Attachment 1: | Split of Scope of Supplies and Services Hyundai – Eisenmann – IPF, revised 2003-09-03 |
| Attachment 2: | Equipment control sheet, revised November26th, 2003 |
| Attachment 3a: | Pricing Template – Overview, revised 2003-12-09 |
| Attachment 3b: | Changes to the contract, revised 2003-12-09 |
| Attachment 4: | Payment schedule, revised 2003-12-09 |
| Attachment 5: | General Terms and Conditions of the Contract (with HMMA) without the Hyundai Technical Contract Specifications and assorted attachments which are included by reference and already in IPF possession |

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\Contract_IPF-America inc_Dec19-2003_HJB.doc

# EISENMANN

770-446-2401

| | | | |
|---|---|---|---|
| IPF AMERICA,INC. | 4586 | Buyer : | MR. BOB KELLER |
| | | Phone : | 815-477-5316 |
| 6611 BAY CIRCLE | | Fax : | 815-356-2586 |
| NORCROSS,GEORGIA, 30071 | | Date : | 11/26/03 |

PURCHASE ORDER NO. 071951-BK /A36-2113/0000

This order is subject to the terms and conditions on reverse side.

IN ORDER FOR PROMPT PAYMENT OF INVOICES PLEASE PROVIDE FREIGHT BACKUP
DOCUMENTATION FOR ALL SHIPMENT IN EXCESS OF $100.00

ALL PRODUCTS SUPPLIED BY OUR VENDORS SHALL BE YEAR 2000 CERTIFIED, IF
APPLICABLE.

ILLINOIS TAX ID NUMBER:  1561-5804

---

| .ine | Quantity | UM | Description | Surcharge/Discount | Price |
|---|---|---|---|---|---|
| | | | Delivery Arrival      : 06/30/04 | | |
| | | | Our Item No        : 9899 | | |
| 1 | 1 | EA | IPF EQUIPMENT FOR HYUNDAI | US$/ EA | 26307946.00 |
| | | | GENERAL ASSEMBLY: | | |
| | | | Cust.Tran.Line : A36-2113  / 0000 | | |

---

L PRODUCTS SHALL BE ABSOLUTELY FREE OF SILICONE
D SHALL BE PAINT-COMPATIBLE!

tify EISENMANN 2 days prior to delivery.  All deliveries must arrive before 12:00 PM.

***** Page   2 follows *****

# EISENMANN

PURCHASE ORDER NO. 071951-BK /A36-2113/0000

Date : 11/26/03
Page :      2

| Line | Quantity UM | Description | Surcharge/Discount | Price |
|------|-------------|-------------|--------------------|-------|

EISENMANN Corporation

26.307.946.00

# EISENMANN

## DRAFT

Date

IPF America, Inc.
6611 Bay Circle
Suite 100
Norcross, GA 30317
Attn.: Mr. Martin Stuckhardt, President.

**Re:**     **Hyundai Final Assembly Line. Our Order # 36-2113.**
          **Purchase Order to IPF # 71951-BK**

Dear Mr. Stuckhardt:

This letter serves to document our formal purchase order  # 71951-BK to your company for

equipment and services as further delineated in attachment 1:  Split of scope of supplies and

services, Hyundai,  EISENMANN, and IPF, for the General Assembly Line at the Hyundai plant

in Montgomery, Alabama.


The IPF Scope of Supply is turn-key to the end user Hyundai Motor Manufacturing, Alabama,

LLC, (HMMA) in terms of both <u>functionality</u> and <u>equipment</u> / <u>services</u>, and shall adhere to all

HMMA specifications as outlined in four (4) volumes labeled "Hyundai Technical Contract

Specifications", presently in IPF's possession.  IPF acceptance of this order also represents

unconditional acceptance of HMMA, Montgomery, Alabama Equipment Contract General Terms

and Conditions of the Contract (Part I & II and attachment) as signed by HMMA and

EISENMANN on May 22, 2003, all of which is contained in copy as attachment 2.  The only

exceptions are payment terms and bonding requirements.  Any liquidated damages for late

delivery and consequential damages are the responsibility of IPF to the extent that all

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\IPF-America Inc  Nov03 HJB.doc

# EISENMANN

percentages are based on the purchase price of this order. In addition, EISENMANN Terms of Contract 3/200 shall apply. In the event of conflict with HMMA General Terms and Conditions, HMMA T&C shall have precedence.

### Total Lump Sum Price:  US$ 26,307,946.00

all freight, duties and taxes are included; payable in monthly progress payments, based on 90% of supplied value with the remaining 10% retainage to be paid upon completion of Final Acceptance of NF model by HMMA and EISENMANN, all thirty (30) days net.

**NOTE:** Above price is a turn-key price.  No extra charges or price changes are allowed except as specifically authorized by Hyundai.  Any agreed price adjustments shall be made at time of the final retainage payment.

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

C:\TEMP\IPF-Americainc_Nov03_HUB.doc

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

# EISENMANN

**SPECIAL CONDITIONS:**

ALL WORK SHALL BE EXECUTED AND INSPECTED IN ACCORDANCE WITH ALL LOCAL, REGIONAL, STATE AND FEDERAL LAWS, ORDINANCES, RULES, REGULATIONS, EQUIPMENT MANUFACTURERS SPECIFICATIONS, ZONING AND BUILDING BY-LAWS. HMMA AND THE OWNERS SPECIFICATIONS APPLICABLE TO THIS CLASS OF WORK. THE CONTRACTOR SHALL PAY ANY FEES IN CONNECTION WITH SUCH INSPECTIONS.

THE LATESTS ISSUE OF CODES AND STANDARDS OF THE FOLLOWING ORGANIZATIONS SHALL BE CONSIDERED AS A MINIMUM REQUIREMENT FOR THE PROJECT. REFER ALSO TO THE HYUNDAI MOTOR MANUFACTURING GENERAL SPECIFICATIONS

ANSI – AMERICAN NATIONAL STANDARDS INSTITUTE
NEC – NATIONAL ELECTRICAL CODE
NFPA – NATIONAL FIRE PROTECTION ASSOCIATION
IEC – INTERNATIONAL ELECTROTECHNICAL COMMISSION
ISO – INTERNATIONAL ORGANIZATION FOR STANDARDIZATION
OSHA – OCCUPATIONAL SAFETY AND HEALTH ACT
EPA – ENVIRONMENTAL PROTECTION ASSOCIATION
ASTM – AMERICAN SOCIETY OF TESTING MATERIALS
ASME – AMERICAN SOCIETY OF MECHANICAL ENGINEERS
AWS – AMERICAN WELDING SOCIETY
AISC – AMERICAN INSTITUTE OF STEEL CONSTRUCTION
UL – UNDERWRITERS LABORATORIES, INC.
FM – FACTORY MUTUAL ASSOCIATION
NEMA – NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION
IEEE – INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS
GISO – GENERAL INDUSTRY SAFETY ORDERS
ASHRAE – AMERICAN SOCIETY OF HEATING, REFRIGERATION AND AIR CONDITIONING ENGINEERS
JIC – JOINT INDUSTRIAL COUNCIL
IES – ILLUMINATION ENGINEERING SOCIETY
IPECA – INSTITUTE POWER CABLE ENGINEERS ASSOCIATION
SAE – SOCIETY OF AUTOMOTIVE ENGINEERS
NECA – NATIONAL ELECTRIC CONTRACTORS ASSOCIATION
IRI – INDUSTRIAL RISK INSURERS
NESC – NATIONAL SAFETY ELECTRICAL SAFETY CODE

ATTENTION SHALL BE GIVEN IN PARTICULAR TO THE FOLLOWING CODES AND PARAGRAPHS: ANSI B11, 19, 20 AND 30, ANSI R1A 15.06, NFPA 79, SAE HS 1738

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\PF-America\inc Nov03 HJB.doc

# EISENMANN

Please document your acceptance of this purchase order by signing at the space provided below.

Sincerely yours,

EISENMANN CORPORATION

Name
Title
Department

Accepted:_____
                    for IPF America, Inc.

Date:_____

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

C:\TEMP\IPF-AmericaInc_Nov03_HJB.doc

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC        Insurance Requirements/OCIP Manual

**FORM C**

## NOTICE OF SUBCONTRACT AWARD

This form is to be completed every time you enter into a contract or subcontract.  Please submit Marsh USA Inc. at the address shown:

MARSH USA INC
Attn: Dawn Colby
One Metroplex Drive, Suite 300
Birmingham, AL 35209
Phone:  205-803-3248

### HYUNDAI PROJECT

BID PACKAGE NAME / NUMBER: _General Assembly Line_

BID PACKAGE NUMBER: _36-2113_

AWARDING CONTRACTOR: _Eisenmann Corporation_

We have awarded a subcontract as follows:

Type of Work: _____

AWARDED TO: _IPF America, Inc_  4584

Address: _6611 Bay Creek, Suite 100_

City, State, Zip: _Norcross, GA ~~30071~~ 30071_

Telephone Number: _770 - 446 - 2401_

Fax Number: _____

E-Mail Address: _nourdin.akaouch@ip-fischer.de_

Date of Subcontract: _5/22/03_

Estimated Contract Amount: _~~30,000,000~~ 26,307,946_

Probable Starting Date: _10/20/03_

Probable Completion Date: _3/06_

_Robert J Keller_ _____    GEN'L MGR. PURCHASING    10/15

Authorized Signature Awarding Contractor        Title        Date

This form must be submitted each time a new subcontract is awarded.  This includes subcontractors who are working on existing projects and are already enrolled in the OCIP program.

TRANSMISSION VERIFICATION REPORT

TIME : 01/06/2004 10:09

| | |
|---|---|
| DATE,TIME | 01/06 10:08 |
| FAX NO./NAME | 90114961727600638 |
| DURATION | 00:01:20 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

09/12/2003  18:23  +49-7031-781390          EISENMANN                    S.    01

EISENMANN
Attachment 1

HYUNDAI, Montgomery
General Assembly
36-2113

## Split of Scope of Supplies and Services Hyundai - Eisenmann - IPF

| Position | | Description | Qty | Engin'g | Supply | Install. | Comm. | Remarks |
|---|---|---|---|---|---|---|---|---|
| 01.0 | 000 | Civil and Building | | | | | | |
| | 100 | Roof / Wall openings | | HY | HY | HY | - | |
| | 200 | Pits for conveyors and process equipment | | HY | HY | HY | - | |
| | 300 | Offices / Sanitary / Canteen | | HY | HY | HY | - | |
| | 400 | Floor preparation | | HY | HY | HY | - | |
| | | | | | | | | |
| 02.0 | 000 | Conveyor Systems | | | | | | |
| 02.1 | 000 | Main Lines | | EN | EN | EN | EN | |
| | | | | | | | | |
| | | Paint - General Assembly | | | | | | |
| | 010a | Skid conveyors from/to paint | | HY | HY | HY | HY | Dürr |
| | 010b | Take over to Trim 1 slat | | HY | HY | HY | HY | Dürr |
| | | | | | | | | |
| | 010 | Trim | | | | | | |
| | 010 | Trim Line 1 | | | | | | |
| | 010c | Slat Conveyor | | EN CL | EN CL | EN CL | EN CL | |
| | 010d | Body pick up at T1and take over to skillet at T2 (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 010 | Trim Line 2 + 3 | | | | | | |
| | 010e | Skillet Conveyor T2 and transfer to T3 | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 010e | Skillet Conveyor T2 and transfer to T3 | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 011 | Take over from Trim 3 to Chassis 1 (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | | | | | | | | |
| | 011 | Chassis Line 1 + 2 | | | | | | |
| | 011 | Heavy Duty EMS | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 011 | Take over from Chassis 2 to Final 1 | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | | | | | | | | |
| | div. | Final Line | | | | | | |
| | 013a | Final 1 Skillet and transfer to Final 2 | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 013a | Final 2 Skillet and empty skid return to Final 1 | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 013b | Take over from Final 2 to Final 3 (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 091 | Final Line 3: Automatic Line (shuttle) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 014a | Take over from Final 3 to Final 4 (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | 014b | Final Line 4: Slat 1x3m wide | | EN CL | EN CL | EN CL | EN CL | |
| | 014b | Final Line 4 Exit: Slat 2x0,6m wide and 1 Ecc. lift table | | EN CL | EN CL | EN CL | EN CL | |
| | 014c | Take over from Final 4 to Final 5 OH until Finishing Line | | EN HGL | EN HGL | EN HGL | EN HGL | |
| | | | | | | | | |
| | 014d | Trim Finish Line 5: Slat 1x3m wide | | EN CL | EN CL | EN CL | EN CL | |
| | 014c | Final Line 5 Entry: Slat 2x0,6m wide and 1 Ecc. lift table | | EN CL | EN CL | EN CL | EN CL | |

HY = Hyundai; EN = Eisenmann, IPF = Industrieplanung Fischer

Doc._I/Responsibility_Matrix EN-HGL-ENCL-IPF
page 1 of 6

revised: 2003-06-03
printed:19.11.2003 - 19:03

**EISENMANN**

HYUNDAI, Montgomery
General Assembly
36-2113.

## Split of Scope of Supplies and Services Hyundai - Eisenmann - IPF

| Position | Description | Qty | Engin'g | Supply | Install. | Comm. | Remarks |
|---|---|---|---|---|---|---|---|
| 012 | Floor Conveyors | | | | | | |
| 012a | Water test conveyors (Belt) | | EN CL | EN CL | EN CL | EN CL | |
| 012b | Quality control conveyor (Slat) | | EN CL | EN CL | EN CL | EN CL | |
| 012c | PDI conveyor (Slat) | | EN CL | EN CL | EN CL | EN CL | |
| 02.2 000 | Secondary Lines | | | | | | |
| 030 | Cockpits (Pallet) | | EN CL | EN CL | EN CL | EN CL | |
| 031 | Seats | | | | | | |
| 031a | Seats until end of Final line 2 (Pallet) | | EN CL | EN CL | EN CL | EN CL | |
| 031b | Front seats from end of F2 to Automatic line (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| 032 | Wheels delivery | | | | | | |
| 032a | Wheels delivery, from trailer dock to destack | | EN CL | EN CL | EN CL | EN CL | |
| 032b | Wheels delivery, from destack to line | | EN CL | EN CL | EN CL | EN CL | |
| 032c | Wheels balance check, wheel mounting handling devices and conveyors inside wheels balance check area | | IPF | IPF | IPF | IPF | |
| 033 | Front End delivery | | EN CL | EN CL | EN CL | EN CL | |
| 035 | Front Suspension delivery | | EN CL | EN CL | EN CL | EN CL | |
| 038 | Rear Suspension delivery | | EN CL | EN CL | EN CL | EN CL | |
| | Engine | | | | | | |
| 034 | Transfer from engine building to GA (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| 021 | Transfer inside Engine Plant (Pallet) | | EN CL | EN CL | EN CL | EN CL | |
| 020 | Doors (EMS) | | EN CL | EN CL | EN CL | EN CL | |
| 110 | Marriage (AGV) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| 095 | Window and Glass supply | | | | | | |
| 095a | primer line, glass subassembly | | IPF | IPF | IPF | IPF | |
| 095b | from primer exit to automatic line (EMS) | | EN HGL | EN HGL | EN HGL | EN HGL | |
| 160 | Batteries (Pallet) | | IPF | IPF | IPF | IPF | |
| 400 | Wiring harness sequencing | | EN CL | EN CL | EN CL | EN CL | |
| 03.0 000 | Process Equipment and Material Handling (Manipulators + Tooling) | | | | | | |
| 040 | Rattle Machine | | IPF | IPF | IPF | IPF | |
| 050 | Wheel Alignment & Headlight Aiming | | IPF | IPF | IPF | IPF | |
| 060 | Roll, Brake Test | | IPF | IPF | IPF | IPF | |
| 070 | Filling Stations | | IPF | IPF | IPF | IPF | |
| 080 | Vin Label Printer | | IPF | IPF | IPF | IPF | |
| 090 | Direct Glazing | | IPF | IPF | IPF | IPF | Supplier Barriers |

HY = Hyundai, EN = Eisenmann, IPF = Industrieplanung Fischer

Def._vResponsibility_Matrix ENHGL-ENCL-IPF
page 2 of 8

revised: 2003-09-03
printed: 19.11.2003 - 19:03

**HYUNDAI, Montgomery**
**General Assembly**
**36-2113**

# EISENMANN

## Split of Scope of Supplies and Services Hyundai - Eisenmann - Eisenmann - IPF

| Position | Description | Qty | Engin'g | Supply | Install. | Comm. | Remarks |
|---|---|---|---|---|---|---|---|
| 100 | Cockpit Loading | | | IPF | IPF | IPF | |
| 110 | Pallets for AGV, front suspension, rear suspension, floating tables on AGV | | | | | | |
| 120 | Tightening System | | IPF | IPF | IPF | IPF | |
| 130 | Spare Tire Loading | | IPF | IPF | IPF | IPF | |
| 140 | Front Seat Loading | | IPF | IPF | IPF | IPF | |
| 160 | Battery Loading | | IPF | IPF | IPF | IPF | |
| 170 | Assist Devices | | IPF | IPF | IPF | IPF | |
| 180 | Water Test Line | | IPF | IPF | IPF | IPF | |
| 200 | Paint Repair Station | | EN CL | EN CL | EN CL | EN CL | |
| 210 | Repair Area Equipment | | EN CL | EN CL | EN CL | EN CL | |
| 220 | Function Crib Equipment | | IPF / EN | IPF / EN | IPF / EN | IPF / EN | |
| 220.1 | Trim Dolly+Guide Rail | 1 set | EN HGL | EN HGL | EN HGL | EN HGL | Skillet |
| 220.2 | Door Subassembly Dolly | 1 set | EN HGL | EN HGL | EN HGL | EN HGL | Doors hanger |
| 220.3 | Monorail and Hoist System | 1 set | EN HGL | EN HGL | EN HGL | EN HGL | Heavy Duty EMS rail system |
| 220.4 | Operation Platform | 6 set | IPF | IPF | IPF | IPF | |
| 220.5 | Chassis Pre-dress Lifter with Mover | 1 set | IPF | IPF | IPF | IPF | |
| 220.6 | Line Support Structure (Steel structure for piping, lighting) | 1 set | EN CL | EN CL | EN CL | EN CL | |
| 220.7 | Line Support Structure (piping, lighting) | 1 set | IPF | IPF | IPF | IPF | |
| 220.8 | Hoist System | 1 set | IPF | IPF | IPF | IPF | |
| 220.9 | Hanger | 3 | EN HGL | EN HGL | EN HGL | EN HGL | Heavy Duty EMS |
| 220.10 | Training Tool Type A | 17 sets | IPF | IPF | IPF | IPF | |
| 220.11 | Training Tool Type B | 17 sets | IPF | IPF | IPF | IPF | |
| 220.12 | Training Tool Type C | 5 sets | IPF | IPF | IPF | IPF | |
| ~~280~~ | ~~Audit Area Equipment~~ | | ~~IPF~~ | ~~IPF~~ | ~~IPF~~ | ~~IPF~~ | |
| 280 | Tools | | IPF | IPF | IPF | IPF | |
| 290 | Special Tools and Fixtures | | IPF | IPF | IPF | IPF | |
| ~~340~~ | ~~Maintenance Shop Equipment~~ | | ~~IPF~~ | ~~IPF~~ | ~~IPF~~ | ~~IPF~~ | |
| 340 | Heating Box | | IPF | IPF | IPF | IPF | deleted |
| 04.0 300 | ~~Logistics / Line-Side Equipment~~ | | | | | | |
| 05.0 000 | Secondary Equipment | | | | | | |
| 270 | Team Areas | | IPF | IPF | IPF | | |
| 380 | Catalogue Items | | IPF | IPF | IPF | IPF | |

HY = Hyundai, EN = Eisenmann, IPF = Industrieplanung Fischer

revised: 2003-09-03
printed:19.11.2003 - 19:03

EISENMANN

HYUNDAI, Montgomery
General Assembly
36-2113

## Split of Scope of Supplies and Services Hyundai - Eisenmann - IPF

| Position | | Description | Qty | Eng'g | Supply | Install. | Comm. | Remarks |
|---|---|---|---|---|---|---|---|---|
| 06.0 | 000 | Selected Options | | | | | | |
| | 600-01 | Floor marking process area | | | | | | |
| | 600-06 | Floor marking | | IPF | IPF | IPF | - | |
| | 600-08 | Working Seat Concept | | IPF | IPF | IPF | - | |
| | 600-10 | Transportation of 13 robots | | - | IPF | - | IPF | approx 3324 m² |
| | | | | | | | | |
| 07.0 | 000 | Electrical / Controls | | | | | | |
| | div | for conveyors | | EN CL | EN CL | EN CL | EN CL | |
| | div | for conveyor lines (pull cords, emergency stop,...) | | EN CL | EN CL | EN CL | EN CL | |
| | div | for process equipment | | IPF | IPF | IPF | IPF | |
| | div | for process lines (pull cords, emergency stop,...) | | IPF | IPF | IPF | IPF | |
| | div | for logistics / line side | | IPF | IPF | IPF | IPF | |
| | div | for water test and paint repair equipment | | EN CL | EN CL | EN CL | EN CL | |
| | div | for secondary equipment | | IPF/ENCL | EN CL | EN CL | EN CL | |
| | div | Line controls | | EN CL | EN CL | EN CL | EN CL | |
| | 242 | Identification systems (barcode readers, etc.) | | EN CL | EN CL | EN CL | EN CL | |
| | 246 | 12V DC Power supply | | IPF | IPF | IPF | IPF | |
| | | Plant controls | | HY | HY | HY | HY | |
| | | ANDON | | HY | HY | HY | HY | |
| | | | | | | | | |
| 08.0 | 000 | Steel Structure | | | | | | |
| | | Working platforms alongside conveyor/process lines | | IPF | IPF | IPF | IPF | |
| | 250.1 | Platform / Mezzanine for conveyors incl. control cabinets | | IPF/ENCL | EN CL | EN CL | EN CL | |
| | | Platform / Mezzanine for Process Equipment incl. control cabinets | | IPF | IPF | IPF | IPF | |
| | 250.2 | Pit covers | | IPF/ENCL | EN CL | EN CL | EN CL | |
| | 250.3 | Pit covers for Process Equipment | | IPF | IPF | IPF | IPF | |
| | 250.4 | Safety fence/structure around conveyors | | EN CL | EN CL | EN CL | EN CL | |
| | 250.5 | Safety fence/structure around process equipment | | IPF | IPF | IPF | IPF | |
| | 250.6 | Fork lift barriers | | IPF/ENCL | EN CL | EN CL | EN CL | |
| | 250.7 | Tool Rails, Tool bags and screwer shelves, spiral hoses | | | | | | |
| | 250.8 | FRL | | IPF | IPF | IPF | IPF | |

HY = Hyundai, EN = Eisenmann, IPF = Industrieplanung Fischer

09/12/2003  18:23  +49-7031-781390          EISENMANN                    S.  05

HYUNDAI, Montgomery
General Assembly
36-2113

## Split of Scope of Supplies and Services Hyundai - Eisenmann - IPF

EISENMANN

| Position | Description | Qty | Engin'g | Supply | Install. | Comm. | Remarks |
|---|---|---|---|---|---|---|---|
| 09.0 000 | Plant Services | | | | | | |
| | Piping - Supply Lines up to T.O.P inside bay | | HY | HY | HY | HY | inside truss level, pressurized air: 1m from bottom |
| 250 | Piping - Distribution Lines from T.O.P to consumer | | | | | | |
| 250 | - compressed dry air | | IPF/ENCL | IPF | IPF | IPF | |
| 250 | - compressed dry air, oiled | | IPF/ENCL | IPF | IPF | IPF | |
| 250 | - Industrial water | | IPF/ENCL | IPF | IPF | IPF | |
| | - potable water | | HY | HY | HY | HY | |
| | Waste water/return lines + waste water treatment | | HY | HY | HY | HY | |
| | General sprinkler system | | HY | HY | HY | HY | |
| 250 | Sprinkler system under covered area (mezzanines,..) piping and headers | | IPF/ENCL | IPF | IPF | IPF | |
| 200 | Sprinkler system inside paint repair booth | | EN CL | EN CL | EN CL | EN CL | |
| | Ventilation | | | | | | |
| 320.1 | Building ventilation | | HY | HY | HY | HY | |
| 320.2 | Ventilation / Exhaust systems at process areas | | IPF | IPF | IPF | IPF | |
| 320.3 | Ventilation / Exhaust systems at paint repair booth | | EN CL | EN CL | EN CL | EN CL | X Supplier: Industrial Ventilation Inc. |
| 340 | Heating at process areas | | IPF | IPF | IPF | IPF | part of 180, 200 |
| 260 | Task Lighting | | | | | | |
| 260.1 | Lighting under covered area (mezzanines, pits,..) | | IPF | IPF | IPF | IPF | |
| 260.2 | Lighting at workstations (process, conveyors) | | IPF | IPF | IPF | IPF | |
| 260.3 | Lighting inside water test and paint repair | | EN CL | EN CL | EN CL | EN CL | |
| 280.4 | Building lighting | | HY | HY | HY | HY | |
| | Media generation | | HY | HY | HY | HY | |
| 10.0 000 | Turn Key Services | | | | | | |
| div | Pr. Management | | - | EN HGL | - | - | |
| div | Local Standards + Regulations | | - | EN CL | - | - | |
| div | Conveyor line drawings | | - | EN CL | - | - | |
| div | Process line drawings | | - | IPF | - | - | |
| div | General Layout | | - | EN HGL | - | - | |
| div | Pit Layout | | - | ENCL | - | - | |
| 11.0 000 | Process Engineering | | | | | | |
| div | Master Process Sheets | | IPF | IPF | | | |
| div | Ergonomics | | HY | HY | | | |
| div | FMEA equipment / process | | EN / IPF | EN / IPF | | | |

HY = Hyundai,  EN = Eisenmann,  IPF = Industrieplanung Fischer

revised: 2003-09-03
printed: 19.11.2003 - 19:03

*EH. # 2*

**HMMA** General Assembly   **EISENMANN** INDUSTRIEPLANUNG FISCHER | | | | |ipf

## Equipment Control Sheet · *November 26th, 2003*

| BP-No. | | Equipment | Responsible IPF | Specification status | Approval Yes | No | Vendor / Supplier | Start Buy-off | Customer Buy-off | Location Buy-Off | Responsible for Buy-Off-Procedure HMMA | EH (TBD) | Sub-Supplier | Installation Begins |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | TIRE DELIVERY SYSTEM | | | | | | | | | | | | | |
| 032-02 | TIRE DELIVERY SYSTEM | Wheel Balance Check | Uhlander | finished | | x | ITW Ride Quality Products | 26.01.2004 | 28.01.2004 | Indianapolis, Indiana | Robin Lee | Kurseler | TBD | 02.02.2004 |
| 032-03 | F3-7 | Wheel mounting device | Orlan | 08.12.03 | | x | Knight Industries 7 | 21.02.2004 | 23.02.2004 | Auburn Hills, Michigan | Robin Lee | ENHCL | TBD | 15.03.2009 |
| 040-060 | TEST EQUIPMENT (EOL) | | | | | | | | | | | | | |
| 040-01 | EOL | Rattle Machine | | | x | | Burke E Porter Machinery Company | 19.01.2004 | 22.01.2004 | Grand Rapids, Michigan | Oscar Lee | Corwat | TBD | 15.01.2004 |
| 050-01 | EOL | Wheel Alignment & Headlight Aiming | Uhlander | finished | x | | | | | | | | | 14.01.2004 |
| 060-01 | EOL | Roll, Brakatest | | | x | | | | | | | | | 19.01.2004 |
| 70 | FILLING EQUIPMENT | | | | | | | | | | | | | |
| 070-01 | TF-2-4 | Power Steering Filling Equipment | | | | x | | | | | | | | 28.01.2004 |
| 070-02 | TF-15-17 | Window Washer Filling Equipment | | | | x | | | | | | | | 04.02.2004 |
| 070-03 | TF-2-4 | Anti-Freeze Coolant Filling | | | | x | | | | | | | | 11.02.2004 |
| 070-04 | F4-12-16 | A/C Evacuation & Filling Incl Repair & Gas Detection | Uhlander | finished | | x | Dürr Production Systems Inc. | 24.01.2004 | 27.01.2004 | Farmington, Michigan | Oscar Lee | Corwat | TBD | 16.02.2004 |
| 070-05 | TF-2-4 | Brake & Clutch Evacuation  & Filling Incl. Repair | | | | x | | | | | | | | 03.03.2004 |
| 070-06 | TF-15-17 | Fuel Filling Equipment Incl. Repair | | | | x | | | | | | | | 10.03.2004 |
| 070-07 | | Automatic Transmission Oil Filling | | | | x | | | | | | | | 17.03.2004 |
| 80 | VIN LABEL PRINTER | | | | | | | | | | | | | |
| 080-01 | T3-4 | VIN Label printer | Gross | finished | | x | Barrion | 20.02.2004 | 20.02.2004 | Pforzheim, D | Steve Soo | TBD | TBD | 08.03.2004 |
| 080-02 | Engine plant | VIN-marking system | | | | x | | | | | | | | 15.03.2004 |
| 90 - 160 | Automatic Line Robot Systems | | | | | | | | | | | | | |
| 090-01 | F3-10-11 | Direct Glazing System | | | | x | | | | | | | | |
| 095-01 | Colas nub | Glass Subassembly | | | | x | | | | | | | | |
| 100-01 | T3-16-17 | Cockpit Loading System | | | | x | | | | | | | | |
| 120-05 | C2-22 | Chassis Line torque check station | Gross | finished | | x | ASM Dimatec | 08.01.2004 | 13.01.2004 | Reus, Spain | Steve Soo | TBD | TBD | 08.02.2004 |
| 130-01 | F3-5 | Spare tire loading system | | | | x | | | | | | | | |
| 140-01 | F3-3 | Front seat loading systems | | | | x | | | | | | | | |
| 160-01 | F3-2 | Battery loading system | | | | x | | | | | | | | |
| 110 | AGV MARRIAGE SYSTEM | | | | | | | | | | | | | |
| 110-02 | Marriage area | Marriage plates frontrear, incl. Checking fixture (s | Gross | finished | | x | Fori Automation | 12.01.2004 | 18.01.2004 | Shelby, Michigan | Peter Kim | TBD | TBD | 03.02.2004 |
| | Marriage area | Marriage plates frontrear, incl. Checking fixture - VDMD-Test Holtzgerlingen (1 unit) | | | | x | | 15.12.2003 | 16.12.2003 | Holtzgerlingen | Peter Kim | Gott | N/A | |
| 120 | TIGHTENING EQUIPMENT | | | | | | | | | | | | | |
| 120-02 | CM-1-2 | Marriage tightening system frontrear  Suspension | | | | x | | | | | | | | 02.02.2004 |
| 120-02 | F3-7 | Tire Nutrunner FrontRear Tire | Gross | finished | | x | Atlas Copco Assembly Systems Inc. | 15.01.2003 | 16.01.2003 | Sterling Heights, Michigan | Peter Kim | Fiddig | TBD | |
| 120-05 | F5-5 | Hub Nutrunner | | | | x | | | | | | | | 06.02.2004 |
| 120-04 | engine plant | AT Conveyor Secure tool engine nub line | | | | x | | | | | | | | |
| 170 | ASSIST DEVICES | | | | | | | | | | | | | |
| 170-01 | T5-6-6 | Door-off Manipulator | | | | x | | 11.02.2004 | 13.02.2004 | | Steve Soo | ENHCL | TBD | 20.02.2004 |
| 170-03 | T3-10-11 | Strut Assist Device | | | | x | | 21.02.2004 | 23.02.2004 | | Peter Kim | ENCL | TBD | 12.03.2004 |
| 170-04 | T4-3 | Head Lining Assist Device | | | | x | | | | | Steve Soo | | | |
| 170-05 | paint shop | Manipulator Sunroof | | | | x | | | | | Oscar Lee | | | |
| 170-07 | T3-116 | Manipulator Cockpit (Back-up & Function Crib) | | | | x | | 11.02.2004 | 13.02.2004 | | Steve Soo | ENHCL | TBD | 20.02.2004 |
| 170-09 | F2-04 | Frontend Manipulator | | | | x | | | | | Steve Soo | | | |
| 170-10 | F2-21-22 | 3rd Seat Assist Device | | | | x | | 28.02.2004 | 01.03.2004 | | Steve Soo | ENCL | | |
| 170-12 | F2-21-22 | 3rd Seat Assist Device | | | | x | | | | | | | | 26.03.2004 |
| 170-14 | F3-11 | Glass Mounting Assist Device (Back-up) | | | | x | | | | | Steve Soo | ENHOL | | |
| 170-16 | F3-04 | Manipulator Front Seat | | | | x | | 11.02.2004 | 13.02.2004 | Auburn Hills, Michigan | Steve Soo | | TBD | 26.02.2004 |
| 170-17 | TF-6-8 | Door-on Manipulator | | | | x | Knight Industries | | | | | | | |
| 170-18 | | Function Crib Door-on | | | | x | | | | | | | | |
| 170-19 | C5-3-4 | Muffler Assist Device | | | | x | | 21.02.2004 | 23.02.2004 | | Peter Kim | ENCL | TBD | 12.03.2004 |
| 170-20 | C1-11 | Manipulator Fuel Tank | | | | x | | 11.02.2004 | 13.02.2004 | | Peter Kim | ENHCL | | 20.02.2004 |
| 170-21 | C5-2 | Propeller Shaft Assist Device | | | | x | | 28.02.2004 | 01.03.2004 | | Peter Kim | ENCL | TBD | |
| 170-22 | F5-3-4 | Spare Tire Assist Device | | | | x | | | | | Robin Lee | | | 26.03.2004 |
| 170-24 | F5-3 | Front Axle | | | | x | | 21.02.2004 | 23.02.2004 | | Peter Kim | ENCL | | 12.03.2004 |
| 170-25 | F1-2 | Engine Transmission | | | | x | | 28.02.2004 | 01.03.2004 | | Peter Kim | ENCL | | 26.03.2004 |
| 170-26 | F1-5 | Transmission transfer | | | | x | | | | | | | | |
| 170-27 | F5-1 | Front suspension | | | | x | | 21.02.2004 | 23.02.2004 | | Peter Kim | ENCL | | 12.03.2004 |
| 170-28 | R5-1 | Rear suspension | | | | x | | | | | | | | |
| 170-29 | C2-6 | Front upper arm loading washer | | | 08.12.2004 | x | | TBD | TBD | | Peter Kim | TBD | TBD | |
| 210 | REPAIR AREA EQUIPMENT | | | | | | | | | | | | | |
| 210-01 | | Portable Solvent Tank | Schmidt | 01.12.2005 | | x | | | | | | | | 26.03.2004 |
| 210-02 | | Hoist System | | 24.11.2005 | | x | | | | | | | | 05.03.2004 |
| 210-04 | | Tire Disassemble Equipment | Schmidt | 01.12.2005 | | x | | | | | | | | 26.03.2004 |
| 210-05 | | Tire Balancing Equipment | | | | x | | | | | | | | 28.03.2004 |
| 210-08 | | Lifters | | finished | | x | | | | | | | | 10.03.2004 |
| 210-10 | | Carts for Paint Bottles | | | | x | | | | | | | | 25.03.2004 |
| 210-11 | | Manual CO2 Welder Incl. Vent. | | | | x | | | | | | | | 25.03.2004 |
| 210-12 | | Body Repair Tool | Schmidt | | | x | | | | | | | | 26.03.2004 |
| 210-13 | | Vehicle Mover | | 01.12.2005 | | x | | | | | no buy-off at vendor | | | 25.03.2004 |
| 210-14 | | Hand held Lighting (110V) Incl. Sockets, electr. test. | | | | x | | | | | | | | 30.03.2004 |

CH  031136  EQ Control Sheet-EXTENDED  A  GCU) xls

**HMMA** General Assembly     **EISENMANN** INDUSTRIEPLANUNG FISCHER

## Equipment Control Sheet   *November 26th, 2003*

| BP-No | | Equipment | Responsible IPF | Specification status | Approval Yes | Approval No | Vendor / Supplier | Start Buy-off | Customer Buy-off end | Location Buy-Off | Responsible for Buy-Off-Procedure HMMA | EN (TBD) | Sub-Supplier | Installation Begin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 210-15 | | Air curtain system | Schmidt / Robinson | 01.12.2003 | | x | | | | | | | | 10.02.2004 |
| 210-16 | | GPS & TV amplification transmitter | Schmidt | 01.12.2003 | | x | | | | | | | | 30.01.2004 |
| 210-17 | | Rear Suspension Repair Lifter | to Liters | | | x | | | | | | | | |
| 210-19 | | Welding Curtain | | | | x | | | | | | | | 25.08.2004 |
| 210-20 | | Door Electric Check Cable | | 01.12.2003 | | x | | | | | | | | 25.03.2004 |
| 210-21 | | Battery Jump Cable | Schmidt | | | x | | | | | | | | 25.01.2004 |
| 210-22 | | Parking Blocks | | | | x | | | | | | | | 19.03.2004 |
| **220** | **FUNCTION CRIB EQUIPMENT** | | | | | | | | | | | | | |
| 220-04 | | Operating Platform | van Bebber | 28.11.2003 | | x | | | | | | | | TBD |
| 220-05 | | Chassis Pre-dress Lifter with Mover incl. Marriage plates | Schmidt / Griesen | 28.11.2003 | | x | | | | | | | | 18.03.2004 |
| 220-07 | | Air styling, Tool Rail | Robinson | 24.11.2003 | | x | | | no buy-off at vendor | | | | | 12.01.2004 |
| 220-07a | | Lighting | Zarate | 08.01.2003 | | x | | | | | | | | 21.01.2004 |
| 220-06 | | Hoist System | Schmidt | 24.11.2003 | | x | | | | | | | | 05.03.2004 |
| 220-10 | | Training Fixture Type A incl. Tools | | | | x | | | | | | | | 16.03.2004 |
| 220-11 | | Training Fixture Type B incl. Tools | van Bebber | 28.11.2003 | | x | | | | | | | | |
| | | Training Fixture Type C incl. Tools | | | | x | | | | | | | | |
| **246** | **12VDC POWER SUPPLY** | | | | | | | | | | | | | |
| 246-01 | | 12VDC Power Supply | Zarate | 21.11.2003 | x | | TBC | TBC | 25.02.2004 | TBC | Oscar Lee | Siller | TBD | 04.03.2004 |
| **250** | **OVERALL STEELWORK** | | | | | | | | | | | | | |
| 250-03 | | Compressed air incl. 225 Reel type hoses & sockets | Robinson | | | x | | | | | | | | 17.01.2004 |
| 250-04 | | Safety basics | | | | x | | | | | | | | 22.01.2004 |
| 250-06 | | Platforms | van Bebber | | | x | | | | | | | | 02.02.2004 |
| 250-06 | | Pit Cover Plates HADS (incl. in Ventilation) | | 28.11.2003 | | x | | | no buy-off at vendor | | | | | 01.03.2004 |
| 250-07 | | Sprinkler systems incl. Fire alarm system | | | | x | | | | | | | | 12.01.2004 |
| 250-07 | | Toolrails | Robinson | | | x | | | | | | | | 16.02.2004 |
| 250-08 | | Toolbags and scanner shelfes | | | | x | | | | | | | | 16.02.2004 |
| 250-10 | | Spiral hoses, FLR | | | | x | | | | | | | | 19.03.2004 |
| **260** | **TASK LIGHTING** | | | | | | | | | | | | | |
| 260-01 | | Line Lighting incl. Pits, underneath platforms & emergency | Zarate | 18.11.2003 | | x | | | no buy-off at vendor | | | | | 21.01.2004 |
| **270** | **TEAM AREAS** | | | | | | | | | | | | | |
| 270-01 | | Partition Wall | | | | x | | | | | | | | 04.03.2004 |
| 270-02 | | Walk-Through Table with Bench | | | | x | | | | | | | | |
| 270-03 | | Table & Chair | | | | x | | | | | | | | |
| 270-04 | | Cabinets | | | | x | | | | | | | | |
| 270-05 | | Book Case | van Bebber | 01.12.2003 | | x | | | no buy-off at vendor | | | | | |
| 270-06 | | Information Board | | | | x | | | | | | | | |
| 270-07 | | Refrigerator & Freezer | | | | x | | | | | | | | |
| 270-08 | | Microwave | | | | x | | | | | | | | |
| 270-09 | | Bottled Water Dispenser | | | | x | | | | | | | | |
| **280** | **SPECIAL TOOLS & FIXTURES** | | | | | | | | | | | | | |
| 280-01 | | Special tools & Subassembly fixtures | | on hold (out of scope IPF) | | | | | | | | | | | |
| 280-02 | engine plant | Engine & Transmission decking lifter | Orlen | | | x | Knight | 21.02.2004 | 23.02.2004 | Auburn Hills, Michigan | Peter Kim | ENCL | TBD | 12.03.2004 |
| 280-03 | engine plant | Engine Secure tool | Omexy | 01.12.2003 | | x | Atlas Copco | 13.01.2004 | 16.01.2004 | Sterling Heights, Michigan | Peter Kim | Fläding | TBD | 02.08.2004 |
| 280-04 | engine plant | Transfercase Loader | Orlen | | | x | Knight | 21.02.2004 | 23.02.2004 | Auburn Hills, Michigan | Peter Kim | ENCL | TBD | 12.03.2004 |
| **320** | **PROCESS VENTILATION** | | | | | | | | | | | | | |
| 320 | | Marriage pit Ventilation | | | | x | | | | | | | | 28.01.2004 |
| 320 | | Fuel filling exhaust & supply | | | | x | | | | | | | | 23.02.2004 |
| 320 | | Glass Cell Glueing Adhesive (exhaust & supply) | | | | x | | | | | | | | 15.03.2004 |
| 320 | | Engine start exhaust, supply & booth | | | | x | | | | | | | | 08.02.2004 |
| 320 | | Air make up unit 50.00 CFM | | | | x | | | | | | | | 02.03.2004 |
| 320 | | repair area / body salvage | | | | x | | | | | | | | 02.02.2004 |
| 320 | | Vehicle Staging Area 02 exhaust (first of RtB Test) | Robinson | finished | | x | | Industrial Ventilation Inc | | no buy-off at vendor | | | | 23.02.2004 |
| 320 | | H.U.D.S. tackle & pit exhaust & supply | | | | x | | | | | | | | 23.02.2004 |
| 320 | | Vehicle Staging Area 03 (exhaust extraction) | | | | x | | | | | | | | 01.03.2004 |
| 320 | | Vehicle Staging Area 04 (exhaust extraction) | | | | x | | | | | | | | 01.03.2004 |
| 320 | | Radio machine exhaust stack | | | | x | | | | | | | | 04.03.2004 |
| 320 | | Vehicle Staging Area 01 exhaust (air spare bay) | | | | x | | | | | | | | 08.03.2004 |
| 320 | | Wheel alignment pit (supply and exhaust) | | | | x | | | | | | | | 15.03.2004 |
| 320 | | Wheel alignment exhaust stack | | | | x | | | | | | | | 15.03.2004 |
| 320 | | Rollbrake test (exhaust stack) | | | | x | | | | | | | | 22.03.2004 |
| **340** | **HEATING BOX** | | | | | | | | | | | | | |
| 340-01 | | Heating Box | Schmidt | on hold til Dec | | x | | 03.03.2004 | | | | | | 15.03.2004 |
| **360** | **CATALOGUE ITEMS** | | | | | | | | | | | | | |

**HMMA** General Assembly  **EISENMANN** INDUSTRIEPLANUNG FISCHER

## Equipment Control Sheet *November 26th, 2003*

| BP-No. | Equipment | Responsible IPF | Specification status | Approval Yes | Approval No | Vendor / Supplier | Start Buy-off | Customer Buy-off end | Location Buy-Off | Responsible for Buy-Off-Procedure HMMA | EH (T&D) | Sub-Supplier | Installation Begins |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 380-01 | Portable Hi-Scan | | | | X | | | | | | | | 16.03.2004 |
| 380-02 | Emission Tester | | | | X | | | | | | | | 16.03.2004 |
| 380-03 | RPM Tester | | | | X | | | | | | | | 16.03.2004 |
| 380-04 | Noise Detector | | | | X | | | | | | | | 18.03.2004 |
| 380-05 | Leak Detection Units A/C | | | | X | | | | | | | | 16.03.2004 |
| 380-06 | Portable Solvent Tank | van Bebber | 03.12.2003 | | X | | | no buy-off at vendor | | | | | 16.03.2004 |
| 380-07 | Facilities for Production | | | | X | | | | | | | | 19.03.2004 |
| 380-08 | Cleaning Car, Toyside, Welding Table | | | | X | | | | | | | | 19.03.2004 |
| 380-09 | Equipment Repair Shop | | | | X | | | | | | | | 19.03.2004 |
| 380-10 | Battery Charger | | | | X | | | | | | | | 22.03.2004 |
| 380-11 | Gangway mirrors | | | | X | | | | | | | | 22.03.2004 |
| 380-12 | Eye Washer | | | | X | | | | | | | | 22.03.2004 |
| 600 | **OPTIONS** | | | | | | | | | | | | |
| 600-01 | Floor marking process area | Robinson | 01.12.2003 | | X | | | no buy-off at vendor | | | | | 15.03.2004 |
| 600-02 | Floor marking | | | | X | | | | | | | | 30.03.2004 |

legend:



: on time
: critical
: schedule impact

09/12/2003  18:23  +49-7031-781390          EISENMANN          S.    09

Attachment 3a

# EISENMANN Project-No. 36-2113
Hyundai General Assembly Line Project

## Pricing Template - Overview

| EISENMANN Sub-contract to: | EISENMANN Purchase Order | EUR | USD | EUR | USD | EUR | USD | EUR | USD | EUR | USD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IPF America, Inc. Norcross, GA, USA | 71961-BK | | 25,844,011 | | 26,198,182 | | 354,161 | | -354,191 | | 25,803,971 |
| Thereof: Robots | | | 0 | | | | 354,151 | | 0 | | |
| Thereof: PDI | | | 0 | | | | 0 | | 109,784 | | |
| Thereof: Other Changes | | | 0 | | | | 0 | | -503,975 | | |

**HYUNDAI - EISENMANN Payment Terms:**
30% Down Payment upon signed Contract Signature Document and signed General Terms and Conditions
15% completion shipment of 40% of total amount
15% completion shipment of 80% of total amount
10% completion shipment of 100% of total amount
20% completion of installation and try out
10% completion of Final Acceptance of NF Model (one month after S.O.P. of the NF model)
Payable within 30 days after 'acceptance and approval of Invoice'.

HMMA, General Assembly, Montgomery

EISENMANN

Changes to the Contract

| CP# IPF | CP# EN | Description | Supplier | HMMA decision | Date | final decision | IPF value [$] |
|---|---|---|---|---|---|---|---|
| | | | | Original Contract Value: | | | 28,846,668 |
| | | | | Total o.k.-Positions: | US $ | | -394,191 |
| | | | | Current Contract Value: | | | 28,452,477 |
| 002 | EN001b | 2nd PDI Line | EN / IPF | to be supplied | 8/22/03 | o.k. | 109,784 |
| | EN002b | Automatic line: reversing friction drive conveyor | EN | to be supplied | 10/23/03 | o.k. | TBD |
| XC001 | EN003 | Assist Device: Front Axle Loader (2) | IPF | to be supplied | 8/20/03 | o.k. | 25,192 |
| XC002 | EN004 | Assist Device: Rear Suspension (1) | IPF | part of the contract | 8/20/03 | o.k. | 27,212 |
| XC003 | EN005 | Assist Device: Carpet (1) | IPF | cancelled, not needed | 8/20/03 | cancelled | |
| XC004 | EN006 | Assist Device: Door off; Function Crib (2) | IPF | take out | 8/20/03 | o.k. | -90,865 |
| XC005 | EN007 | Assist Device: Sun roof; Function Crib (1) | IPF | take out | 8/20/03 | o.k. | -38,654 |
| XC006 | EN008 | Assist Device: Seat; Function Crib (1) | IPF | take out | 8/20/03 | o.k. | -58,173 |
| XC007 | EN009 | Assist Device: Rear Bumper; Function Crib (1) | IPF | take out | 8/20/03 | o.k. | -35,288 |
| XC008 | EN010 | Assist Device: Glass Mount.; Function Crib (1) | IPF | take out | 8/20/03 | o.k. | -30,096 |
| XC009 | EN011 | Assist Device: Front Suspension (1) | IPF | part of the contract | 8/20/03 | o.k. | 28,750 |
| XC011 | EN013 | Assist device rails (HMMA wants Zimmermann instead of KBK) | IPF | to be supplied | 9/9/03 | o.k. | 28,846 |
| XC0018 | EN014a | Front upper arm device (new system) | IPF | to be supplied | 10/23/03 | o.k. | 118,182 |
| XC0013 | EN024 | Rear Glass Installation | EN/IPF | to be supplied | 10/23/03 | o.k. | 54,545 |
| XC0014 | EN025 | Repair Area Equipment take out | IPF | take out | 10/23/03 | o.k. | -211,538 |
| XC0015 | EN026 | Rail system Extension for Muffler and Propeller | IPF | to be supplied | 10/23/03 | o.k. | 0 |
| XC0016 | EN027 | Working (Seat) trolley concept: HMMA might delete this completely | IPF | take out | 10/23/03 | o.k. | -144,204 |
| XC0017 | EN028 | Additional platform for fuel tank | IPF | to be supplied | 10/23/03 | o.k. | 0 |
| | EN029 | Delete Rear Suspension repair lifter | IPF | take out | 10/23/03 | o.k. | -28,845 |
| | EN030 | Reduced Quantity of Front and Rear suspension pallets and combined rear susp. pallet | IPF | Changes accepted | 10/23/03 | o.k. | -149,038 |
| | From EN001b to EN030 | | | | | | -500,975 |

revised: 2003-12-09
printed: 12/23/03 • 9:58 AM

CONTRACT No. TR20035001

# HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC MONTGOMERY, ALABAMA

## General Assembly Line Turn-Key Project

## Part I – Contract Signature Document

THIS AGREEMENT, is made and entered into as of *May 22. 2003* by and between Hyundai Motor Manufacturing Alabama, LLC, a Delaware limited liability company, with a place of business at 7515 Halcyon Summit Drive, Montgomery, Alabama 36117, U.S.A. (hereinafter "Owner," or "HMMA"), and BISENMANN CORPORATION, (hereinafter referred to as "Contractor"), whose address is at 150 E. Dartmoor Drive, Crystal Lake, IL 60014, U.S.A.

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

### Section 1.0 Contract Documents

This Contract shall consist of the Confidentiality Agreement between HMMA and Contractor, and the following documents, and the exhibits, attachments, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

| | |
|---|---|
| PART I | Contract Signature Document (this document) |
| PART II | General Terms and Conditions of the Contract |
| PART III | Special Conditions of the Contract (if any) |
| PART IV | Request for Proposal and Contractor's Proposal |

This Contract, as so defined, constitutes and contains the entire and only agreement between the parties, and supersedes and cancels any and all pre-existing agreements and understandings between the parties, relating to the subject matter hereof. Any and all prior and contemporaneous negotiations, requests for proposals, purchase orders and preliminary summaries, drafts and prior versions of this Contract, whether signed or unsigned, between the parties leading up to the execution hereof shall not be used by either party to construe, alter or amend the terms or affect the validity of this Contract. No representation, inducement, promise, understanding, condition, warranty or guarantee not set forth in this Contract has been made or relied upon by either party. No agreement or understanding modifying the terms of this Contract shall be binding on Owner or Contractor unless made in writing and signed on behalf of Owner and Contractor. Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation or performance of this Contract. All capitalized terms used but not defined herein shall have the definitions assigned to them in Part II, General Terms and Conditions of the Contract.

### Section 2.0 Contract Price

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be $ 71,630,982.00 (the "Contract Price).

Terms of Payment:

22.5.2003    1)    30% down payment upon signed Contract Signature Document and signed General Terms and Conditions.

      2)    40% shipment

    30. Nov 03 –   15% completion of shipping  40% of total amount
    15. Jan 04 –   15% completion of shipping  80% of total amount
    15. Feb 04 –   10% completion of shipping 100% of total amount

3.1.5.2004    3)    20% completion of Installation and try out

31.3.2005    4)    10% completion of Final Acceptance of NF model

hereinafter called the "Work"

## Section 4.0  Liability for Delays

In the event that Contractor does not achieve successful completion of the trial run of Work by the agreed upon date as set forth in the Schedule, or as may be modified by a Change Order, Owner, as its sole monetary remedy for Contractor's failure to meet such date shall be entitled to retain, as liquidated damages, up to 0.1% of contract price for each day that successful completion of trial run is delayed, up to a maximum of 5% of contract price.  The parties agree that the liquidated damages stated herein are a good faith estimate on the part of the parties at the time of entering into this Contract of the amount of damages that Owner will actually incur in the event that the Schedule is not met and further agree that such liquidated damages are not a penalty.

IN WITNESS WHEREOF, the parties hereto have executed this Contract under seal on the day and year below written, but effective as of the day and year first set forth above (the "Effective Date").

| HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC (Owner) | EISENMANN CORPORATION (Contractor) |
|---|---|
| By: _Minho Lee_ | By: _Herbert J. Buder_ |
| Printed Name: | Printed Name:  Herbert J. Buder |
| Title:  _VP, Purchasing_ | Title:  Vice President, Finance & Admin. |
| Witnessed | Witnessed |
| By: _J K S M_ | By: _Doerthe Koenig_ |
| Printed Name:  _KEVIN SOO JU_ | Printed Name:  Doerthe Koenig |
| Title:  _Senior Director PRODUCTION ENGINEERING_ | Title:  Executive Secretary |
| | U.S. Taxpayer Identification No. _38-2166245_ <br> Alabama General Contractor's License No. _026084_ |

## Part I - Contract Signature Document

THIS AGREEMENT, is made and entered into as of {      contract date      } by and between **Hyundai Motor Manufacturing Alabama, LLC,** a Delaware limited liability company, with a place of business at 7515 Halcyon Summit Drive, Montgomery, Alabama 36117, U.S.A. (hereinafter "Owner," or "HMMA"), and {contractor name}, (hereinafter referred to as "Contractor"), whose address is at { contractor's address}.

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

### Section 1.0 Contract Documents

This Contract shall consist of the Confidentiality Agreement between HMMA and Contractor, and the following documents, and the exhibits, attachments, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

| | | | |
|---|---|---|---|
| 1 | PART I | Contract Signature Document (this document) | + 20% |
| 2 | PART II | General Terms and Conditions of the Contract | |
| 3 | PART III | Special Conditions of the Contract (if any) | |
| | PART IV | Request for Proposal and Contractor's Proposal | |

↳ technical specification

This Contract, as so defined, constitutes and contains the entire and only agreement between the parties, and supersedes and cancels any and all pre-existing agreements and understandings between the parties, relating to the subject matter hereof. Any and all prior and contemporaneous negotiations, requests for proposals, purchase orders and preliminary summaries, drafts and prior versions of this Contract, whether signed or unsigned, between the parties leading up to the execution hereof shall not be used by either party to construe, alter or amend the terms or affect the validity of this Contract. No representation, inducement, promise, understanding, condition, warranty or guarantee not set forth in this Contract has been made or relied upon by either party. No agreement or understanding modifying the terms of this Contract shall be binding on Owner or Contractor unless made in writing and signed on behalf of Owner and Contractor. Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation or performance of this Contract. All capitalized terms used but not defined herein shall have the definitions assigned to them in Part II, General Terms and Conditions of the Contract.

### Section 2.0 Contract Price

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be $_____ (the "Contract Price").



1. Minutes of Meetings from 13 March 2003 on
2. Basic Requirements
3. Individual Specification
4. Contractor's Proposal of 05 March 2003
5. All other technical documents

### Section 3.0 Scope Of Work

Contractor shall supply all labor, supervision, tools, equipment, installed and consumable materials, services, testing devices and warehousing and each and every item of expense necessary for the design, engineering, supply, fabrication, field erection, application, handling, hauling, unloading, receiving and storage, installation, assembly, testing (excluding soils and concrete testing), checkout, startup, evaluation, performance and quality assurance of the Equipment as described more fully in the Specifications and Drawings attached hereto, hereinafter called the "Work".

### Section 4.0  Liability for Delays

In the event that Contractor does not achieve successful completion of the trial run of Work by the agreed upon date as set forth in the Schedule, or as may be modified by a Change Order, Owner, as its sole monetary remedy for Contractor's failure to meet such date shall be entitled to retain, as liquidated damages, up to $ 3,565,000 _____ accruing per day in the amount of $_____ for each day that successful completion of trial run is delayed.  The parties agree that the liquidated damages stated herein are a good faith estimate on the part of the parties at the time of entering into this Contract of the amount of damages that Owner will actually incur in the event that the Schedule is not met and further agree that such liquidated damages are not a penalty.

IN WITNESS WHEREOF, the parties hereto have executed this Contract under seal on the day and year below written, but effective as of the day and year first set forth above (the "Effective Date").

| HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC (Owner) | {contractor name}  (Contractor) |
|---|---|
| | |
| By:_____ | By:_____ |
| Printed Name:_____ | Printed Name:_____ |
| Title:_____ | Title:_____ |
| Witnessed | Witnessed |
| By:_____ | By:_____ |
| Printed Name:_____ | Printed Name:_____ |
| Title:_____ | Title:_____ |
| | U.S. Taxpayer Identification No._____ Alabama General Contractor's License No._____ |

1069689

**HYUNDAI MOTOR
MANUFACTURING ALABAMA, LLC
MONTGOMERY, ALABAMA**

**EQUIPMENT CONTRACT**

**PART II**

**GENERAL TERMS AND CONDITIONS OF THE CONTRACT**

**Hyundai Motor Manufacturing Alabama, LLC**
**Montgomery, Alabama**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | GENERAL PROVISIONS | 1 |
| | 1.1 This Agreement | 1 |
| | 1.2 Precedence | 1 |
| | 1.3 Definitions | 1 |
| 2. | SCOPE OF WORK | 1 |
| | 2.1 Description of Work - General | 4 |
| | 2.2 Specifications, Drawings, Attachments | 4 |
| | 2.3 Conditions and Risks of Work; Omissions | 4 |
| | 2.4 Use of Drawings and Specifications | 5 |
| | 2.5 Intent of Specifications and Drawings | 6 |
| | 2.6 Samples | 6 |
| | 2.7 Procurement | 6 |
| 3. | DELIVERY, TITLE AND RISK OF LOSS | 6 |
| | 3.1 Delivery | 7 |
| | 3.2 Evidence of Insurance | 7 |
| | 3.3 Notice to Owner | 7 |
| | 3.4 Schedule | 7 |
| | 3.5 Storage | 8 |
| | 3.6 Title and Risk of Loss | 8 |
| 4. | TIME OF PERFORMANCE AND SCHEDULES | 8 |
| | 4.1 Time of Performance | 9 |
| | 4.2 Delays | 9 |
| | 4.3 Directed Rate of Progress | 11 |
| 5. | MATERIAL, EQUIPMENT, PERMITS OR SERVICES FURNISHED BY OWNER | 11 |
| | 5.1 Utilities for Contractor's On-Site Office | 12 |
| | 5.2 Owner Furnished Material and Equipment | 12 |
| 6. | TEMPORARY FACILITIES AND UTILITIES | 12 |
| | 6.1 Furnished by Contractor | 12 |
| | 6.2 Furnished by Owner | 12 |
| 7. | CONTRACTOR'S PERSONNEL, EQUIPMENT AND PRACTICES | 13 |
| 8. | REPORTING REQUIREMENTS & COORDINATION MEETINGS | 14 |
| | 8.1 Reports | 17 |
| | 8.2 Coordination Meetings | 17 |
| | 8.3 Other Meetings | 17 |
| 9. | DATA REQUIREMENTS | 17 |
| 10. | INSTALLATION | 17 |
| | 10.1 Security Program | 18 |
| | 10.2 Joint Occupancy | 18 |
| | 10.3 Construction Area Limits | 19 |
| | 10.4 Restricted Roads Next to Contractor's Area | 19 |
| | 10.5 Contractor's Office at Site of Work | 19 |
| | 10.6 Radios On Site | 19 |
| | 10.7 Personnel Identification | 19 |
| | 10.8 No Smoking | 19 |
| | 10.9 Personnel Clothing and Equipment | 19 |
| | 10.10 Dust Control | 19 |
| | 10.11 Water Pollution | 19 |
| | 10.12 Air Pollution | 19 |
| | 10.13 Ventilating | 19 |

|        | 10.14 | Site Signs. | 20 |
|        | 10.15 | Drainage. | 20 |
|        | 10.16 | Lunch Facilities. | 20 |
|        | 10.17 | Construction Entrance. | 20 |
|        | 10.18 | Time Alleys and Timekeepers. | 20 |
|        | 10.19 | Removal of Equipment, Materials etc. from Jobsite. | 20 |
|        | 10.20 | Oil Clean-Up. | 20 |
|        | 10.21 | Review by Owner. | 20 |
|        | 10.22 | Existing Services. | 20 |
|        | 10.23 | Quality Control. | 20 |
| 11. | | PREPARATION FOR SHIPMENT | 21 |
| 12. | | WARRANTIES, GUARANTEES AND BONDS | 21 |
| 13. | | INSPECTION, TESTS AND ACCEPTANCE. | 22 |
| 14. | | INSURANCE | 23 |
|        | 14.1 | Insurance to be Provided by Contractor. | 24 |
|        | 14.2 | Owner-Controlled Insurance Program. | 24 |
|        | 14.3 | Insurance provided by Owner. | 26 |
| 15. | | INDEMNITIES AND LIMITATIONS OF LIABILITY | 27 |
| 16. | | SAFETY WORK RULES AND REGULATIONS | 27 |
| 17. | | TERMINATION | 28 |
|        | 17.1 | Termination and Default. | 30 |
|        | 17.2 | Termination at Owner's Option | 30 |
| 18. | | DISPUTE RESOLUTION. | 31 |
|        | 18.1 | Arbitration. | 32 |
|        | 18.2 | Notice. | 32 |
|        | 18.3 | Continuance of Work. | 32 |
|        | 18.4 | Waiver of Trial by Jury. | 32 |
| 19. | | CONTRACT PRICE | 32 |
|        | 19.1 | Payment Terms. | 33 |
|        | 19.2 | Pricing Basis. | 33 |
|        | 19.3 | Pricing for Changes. | 33 |
|        | 19.4 | Taxes. | 33 |
|        | 19.5 | Final Payment. | 34 |
|        | 19.6 | Release. | 35 |
|        | 19.7 | Grounds for Withholding Payment. | 35 |
|        | 19.8 | Certain Indemnity. | 35 |
|        | 19.9 | No Liens. | 35 |
|        | 19.10 | Invoices. | 36 |
|        | 19.11 | Right to Offset. | 36 |
|        | 19.12 | Claims. | 36 |
|        | 19.13 | Backcharges. | 37 |
| 20. | | DOCUMENTATION AND RIGHT OF AUDIT | 37 |
| 21. | | CHANGES | 38 |
| 22. | | SUBCONTRACTORS, SUPPLIERS AND PURCHASE ORDERS | 39 |
| 23. | | OWNER'S OTHER CONTRACTORS | 40 |
|        | 23.1 | The Site. | 40 |
|        | 23.2 | The Project. | 40 |
| 24. | | INDUSTRIAL AND INTELLECTUAL PROPERTY | 40 |
|        | 24.1 | No Infringement. | 40 |
|        | 24.2 | Ownership of Materials. | 40 |
| 25. | | COMMUNICATIONS | 40 |
| 26. | | MISCELLANEOUS | 41 |
|        | 26.1 | Verbal Agreements. | 41 |
|        | 26.2 | Third Party Beneficiaries. | 41 |
|        | 26.3 | Assignment. | 41 |
|        | 26.4 | Laws, Regulations and Jurisdiction. | 41 |

| 26.5 | Confidential Information. | |
|---|---|---|
| 26.6 | Signs. | 42 |
| 26.7 | Publicity. | 42 |
| 26.8 | Gratuities. | 42 |
| 26.9 | Survival of Obligations. | 42 |
| 26.10 | Headings. | 42 |
| 26.11 | Execution in Counterparts. | 42 |
| 26.12 | No Recourse to Owner. | 42 |
| 26.13 | Waiver. | 42 |
| 26.14 | Contract Under Seal. | 42 |
| 26.15 | Severability. | 43 |
| 26.16 | Limitation of Liability | 43 |

Attachments to these General Terms and Conditions of the Contract:

| Attachment 2.2.1 | Specifications |
|---|---|
| Attachment 2.2.2 | Drawings |
| Attachment 2.7.2 | List of Subcontractors |
| Attachment 2.7.4 | Spare Parts Management Program |
| Attachment 4.1.7.1 | Schedule |
| Attachment 5.1 | Utility Responsibilities for On-site Office |
| Attachment 8.1.2 | Contract Daily Report |
| Attachment 10.23 | Quality Assurance Procedures |
| Attachment 12.2 | Silicone Contamination Avoidance Agreement |
| Attachment 12.6 | Bonds and Guarantees |
| Attachment 14.1.5 | Certificate of Insurance |
| Attachment 14.2.1 | Owner Controlled Insurance Program Manual |
| Attachment 16.7 | Site Environmental Safety and Health Program Requirements |
| Attachment 16.7(2) | Owner's Drug and Alcohol Policy |
| Attachment 16.8(1) | Hazardous and Toxic Substances Disclosure Requirements |
| Attachment 16.8(2) | Material Safety Data Sheet/OSHA Form - 174 |
| Attachment 19 | Lump Sum Contract Price Breakdown and Schedule of Values |
| Attachment 19.4.2 | Alabama Department of Revenue Sales Tax Exemption Procedures |
| Attachment 19.5 | Final Acceptance Procedures and Requirements |
| Attachment 19.5.1.1 | Final Release and Waiver of Contractor |

Attachment 19.5.1.2        Final Release and Waiver of Subcontractor/Supplier

Attachment 19.10.3(1)      Partial Release and Waiver of Contractor

Attachment 19.10.3(2)      Partial Release and Waiver of Subcontractor/Supplier

Attachment 21.1            Change Notification

Attachment 21.3            Change Order

Attachment 26.4.1          Foreign Trade Zone Program Requirements

Attachment 26.4.2          Environmental Protection Plan for the Work

Attachment 26.5            Confidentiality Agreement